UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BREWERY PROPERTIES GROUP, LLC, | ) | Case No. 11-14208-JNF |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## DISCLOSURE STATEMENT REGARDING DEBTOR'S CHAPTER 11 PLAN

Submitted herewith for approval by this Court is the Proposed Disclosure Statement

Regarding Debtor's Chapter 11 Plan dated May 6, 2011.

Respectfully submitted this 6th day of May, 2011.

<div style="margin-left:40%">

BREWERY PROPERTIES GROUP, LLC

By its proposed attorneys,

/s/  Michael J. Goldberg
Michael J. Goldberg (BBO #551869)
A.  Davis Whitesell (BBO #551462)
Andrew Imbriglio (BBO #676049)
CASNER & EDWARDS, LLP
303 Congress Street
Boston, MA 02210
Tel.: (617) 426-5900
Fax: (617) 426-8810
Email: *goldberg@casneredwards.com*

</div>

THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THIS FORM OF DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT, BUT HAS NOT YET BEEN APPROVED.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

|  |  |
|---|---|
| In re: | Chapter 11 |
| BREWERY PROPERTIES GROUP, LLC | Case No. 11-14208-JNF |
| Debtor-in-possession. | |

**DISCLOSURE STATEMENT FOR
CHAPTER 11 PLAN OF REORGANIZATION OF
BREWERY PROPERTIES GROUP, LLC**

Michael J. Goldberg (BBO #551869)
A. Davis Whitesell (BBO #551462)
Andrew Imbriglio (BBO #676049)
CASNER & EDWARDS, LLP
303 Congress Street
Boston, MA 02210
Tel.: (617) 426-5900
Fax: (617) 426-8810
Email: goldberg@casneredwards.com
Proposed Counsel for the Debtor

BREWERY PROPERTIES GROUP, LLC

Dated: May __, 2011

## I.    INTRODUCTION

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code"), the debtor Brewery Properties Group, LLC (the "Debtor"), provides this Disclosure Statement (the "Disclosure Statement") to all of the Debtors' known creditors. The purpose of this Disclosure Statement is to provide such information as the Debtor has deemed necessary for the Debtors' creditors to make an informed decision in exercising their rights to vote upon the *Debtor's Chapter 11 Plan* (the "Plan") dated as of the date of this Disclosure Statement. The Plan, a copy of which accompanies this Disclosure Statement as Exhibit A, was filed with the Bankruptcy Court on May 6, 2011. Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in Article I of the Plan. Other terms shall have the meanings ascribed to them in the Bankruptcy Code. To the extent there may be any inconsistency between the Plan and the Disclosure Statement, the Plan shall control.

*Why Should Creditors Support this Plan?*

The Debtor recommends that you vote to accept the Plan. The Debtor believes that the treatment provided to all of the Debtors' creditors is fair and reasonable, inasmuch as it provides general unsecured creditors with payments over time equal to 100% of the Allowed Amount of their Claims, with a guaranteed dividend of 10% of the principal amount of Allowed Claims as early as on the Effective Date. The Debtor's ability to make these payments is based, in part, on an agreement with a group of investors, some of whom are currently equityholders of the Debtor (the "Plan Funders"), to provide an infusion of Cash to make the Effective Date payments to unsecured creditors, and to pay Allowed Administrative Expenses and Allowed Priority Claims in full. In exchange for this funding, the Plan Funders shall be issued 100% of the Equity Interests in the Reorganized Company on the Plan's Effective Date.

*What Is the Basic Plan?*

The Debtor's principal asset is the real estate, and partially-renovated brewing facility built thereon (the "Facility"), located at 2 Soffron Lane, Ipswich, Massachusetts (the "Property"). The Debtor is a party to a lease for the Property dated November 1, 2008 (the " Mercury Lease") with Mercury Brewing and Distribution Co., Inc. ("Mercury"), pursuant to which Mercury was to have relocated its brewing operations to the Facility. Under the Lease, Mercury was to commence paying rent on April 1, 2009, but has failed to make any of the required monthly rental payments under the Lease.

As of the Petition Date, Mercury's arrearages under the Lease amounted to $512,124.35 (the "Rent Arrearage"). Utilizing the Rent Arrearage and the funding to be provided by the Plan Funders, the Plan provides as follows:

- Except as otherwise agreed by the Holders of Allowed Administrative Expenses and Allowed Priority Claims, all Holders of Allowed Administrative Expenses and Allowed Priority Claims will be paid in Cash in the full amount of their Allowed Claims;

- The Holder of the Soffron Secured Claim will be paid all arrearage amounts due as of the Effective Date, and be restored to all of its legal, equitable or contractual rights as they exist under the Senior Loan Documents, including without limitation the reinstatement of the maturity date under the Senior Loan Documents;

- The Holder of the Danversbank Secured Claim, arising from the Debtor's guaranty of the indebtedness of Mercury to Danversbank, shall be restored to all of its legal, equitable or contractual rights as they exist under the Danversbank Loan Documents;

- Except as otherwise agreed by the Holders of Allowed General Unsecured Claims, all Holders of Allowed General Unsecured Claims (including without limitation, NYLAJO and the Holders of deficiency Claims arising out of Statutory Liens) shall receive (i) in Cash, on or as soon as practicable after the Effective Date, a payment equal to ten percent (10%) of the Allowed Amount of such Allowed General Unsecured Claims, and (ii) quarterly payments over time equal to the remaining unpaid balance of their Allowed Claims; and

- On the Effective Date, all Interests shall be deemed cancelled and extinguished, and the Holders of Interests will not receive any distribution, or be entitled to retain any property or interest in property, on account of such Interests.

**EACH CREDITOR SHOULD REVIEW THE PLAN AND DISCLOSURE STATEMENT CAREFULLY, INCLUDING ALL EXHIBITS, IN THEIR ENTIRETY, AND DETERMINE WHETHER OR NOT TO ACCEPT OR REJECT THE PLAN BASED UPON THAT CREDITOR'S INDEPENDENT JUDGMENT AND EVALUATION.** The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

Consistent with the requirements of the Bankruptcy Code, the Debtor's goal is to obtain an order from the Bankruptcy Court confirming the Plan. That order, the "Confirmation Order," will contain other provisions as well, but approval of the Plan is the core of such an order. After voting on the Plan is completed, a confirmation hearing will be held before the Bankruptcy Court. If the Bankruptcy Court then confirms the Plan, the Plan becomes binding on the Debtor, its creditors, its equity holders, and other affected parties, including those who may have voted against the Plan.

Certain of the information contained in this Disclosure Statement is by its nature forward looking, and contains estimates, assumptions, and projections that may be materially different from actual, future results. The statements made in this Disclosure Statement are made as of the date hereof, unless another time is specified in this Disclosure Statement. The delivery of this Disclosure Statement shall not, under any circumstances, create an implication that there has been no change in any facts set forth in this Disclosure Statement since the date hereof.

This Disclosure Statement has **[not yet]**[1] been approved by the Bankruptcy Court as

---

[1] To be removed upon approval of this Disclosure Statement by this Court.

providing information that the Bankruptcy Court deemed adequate to permit creditors of the Debtors to make an informed judgment in exercising their right to vote for or against the Plan. **A HEARING ON THE ADEQUACY OF THE DISCLOSURE STATEMENT IS SCHEDULED FOR_____, 2011 AT _:_ .M. THE DEADLINE FOR FILING OBJECTIONS TO THIS DISCLOSURE STATEMENT IS _____, 2011 AT 4:30 P.M.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

No representations concerning the Debtors including the value of its assets, or the aggregate dollar amount of Claims which may be allowed, are authorized other than as set forth in this Disclosure Statement. Any representations, warranties or agreements made to secure acceptance or rejection of the Plan by creditors of the Debtor, which are other than as contained in this Disclosure Statement, should not be relied upon in voting on the Plan.

## II.    BACKGROUND AND HISTORY

### A.    Introduction

The Debtor was formed on January 23, 2008. Its initial managers were Robert Martin ("Martin") and Todd Darling ("Darling"), who also held 100% of the Debtor's Membership Interests. At the time, Martin was the President of Mercury, a position which he continues to hold. The Debtor was formed for the sole purpose of acquiring the Property and renovating the Facility, which was to serve as the new location for Mercury's growing beer brewing and distribution operations (the "Project"). To finance the $825,000 purchase price for the Property and the costs of renovating of the Facility, the Debtor and Mercury obtained a $1.98 million real estate bond financing (the "Real Estate Loan") from Danversbank (the "Bank"). The Real Estate Loan is secured by a first mortgage on the Property (the "Mortgage"). Repayment of the Real Estate Loan was guaranteed by Martin and Darling; in addition, another member of the Debtor, Peter McAllister, provided a $250,000 completion guaranty to the Bank. To aid in the funding of the Facility's renovation cost, the Debtor raised additional funds from the sale of Membership Interests to investors in the Debtor, including Darling. Martin did not contribute any of his own funds to defray the cost of the Project.

Under the agreements between the Debtor and Mercury, the Debtor was to finance the renovation of the Facility, while Mercury was to pay for the cost of tenant improvements and equipment needed to operate the Facility as a brewery. At the same time that the Real Estate Loan was procured, Mercury obtained a $757,300 term loan (the "Mercury Term Loan") from the Bank, a portion of which refinanced existing indebtedness of Mercury, and another portion of which was advanced to fund tenant improvement and equipment costs. In addition, the Bank extended a $100,000 working capital line of credit to Mercury (the "Mercury Credit Line" and, together with the Mercury Term Loan, the "Mercury Loans"). The Mercury Loans were guaranteed by the Debtor (the "Danversbank Guaranty"), Martin and an entity known as

Brewery Food Group, LLC ("BFG").  BFG was formed for the purpose of operating a pub at the Facility.

In connection with the Real Estate Loan, the Debtor and Mercury entered into the Mercury Lease, which provided, *inter alia*, for monthly rental payments of $19,000 commencing on April 1, 2009.  Because it was expected that the renovation would be complete by that date, the Mercury Lease did not condition the commencement of rent payments on the completion of the Project.  More important, since the renovation project was to be overseen by the tenant Mercury, there was no need for a provision tolling the commencement of rent payments based on the completion of construction.  Nevertheless, Mercury has failed to make a single payment of rent under the Mercury Lease, raising, without basis, the failure to complete the Project as a defense.

Martin was charged with overseeing the Project on behalf of the Debtor and, of course, Mercury.  In that capacity, he arranged for the services of an architect, Frank Wardley, a partner of Pitman & Wardley Architects of Salem, Massachusetts ("Wardley") to design plans for the Project (the "Plans").  He also caused the Debtor to enter into a fixed-price construction contract (the "General Contract") with a general contractor, Thomas Hagan ("Hagan") in the amount of $1,343,374; included in the fixed price was a 10% contingency.  The General Contract provided for the work necessary to renovate the Facility in accordance with the Plans – in essence, a basic shell building.

### B.     Construction Cost Overruns and Disputes

Upon the closing of the Real Estate Loan and the Mercury Loans, Martin, in his capacity as Manager of the Debtor, assumed control of the Project on its behalf.  Among other things, he was the primary contact with the Bank, Wardley, Hagan and other contractors working on the project.

Despite the understandings between the Debtor and Mercury concerning the allocation of the costs of the Project, Martin who held 100% of the common stock of Mercury – caused the Debtor to bear Project costs that should have been paid by Mercury.  This benefited Martin, of course, whose interests in Mercury would be worth more if he could allocate Mercury's construction costs to the Debtor.  For example, he caused bills addressed to Mercury for HVAC costs constituting tenant improvements to be paid by the Debtor.  He also agreed to a series of requests from Hagan and other contractors for increases to their scope of work, virtually ignoring the fixed-price aspect of the General Contractor.  Among the out-of-scope items that Martin approved for the benefit of Mercury, but at the expense of the Debtor, were the following: (i) a full basement suite complete with HVAC, (ii) pharmaceutical grade plumbing supplies, (iii) $CO_2$ plumbing, (iv) steel for brew house plumbing, (v) brew house plumbing and old boiler retrofitting, (vi) costs for a new well head, and (vii) two full baths, showers and a laundry room.  The costs of these and other unauthorized tenant improvements, taken together with Martin's mismanagement, drove the costs of the Project over budget by $1 million or more.[2]  The costs of

---

[2]  Other cost overruns resulted from the addition of decorative stars and a cupola to the Facility; the reconfiguration of the road and walkway on the Property; and the raising of a portion of the Facility's walls and roof to accommodate brewing equipment.  In some cases, Martin failed to give prior notice of these changes; in others, he

HVAC alone were grossly inflated by a factor of three or more, based on the original amount of $90,000 included in the General Contract, due to many of the extra items listed above. These changes were agreed to without the benefit of formal change orders, and without any notice to Todd Darling, the co-manager of the Debtor, or to the other members of the Debtor.

Compounding his malfeasance, Martin failed to maintain separate financial accounts for the Debtor and Mercury, regularly commingling the funds of the two entities.

Not surprisingly - given that they arose largely from an improper shifting of tenant improvement costs from Mercury to BPG – Martin failed to apprise Darling or the Additional Members of any of these cost overruns. Instead, he regularly reassured Darling that the Project, while experiencing some delays, was proceeding according to the parties' expectations. Finally, in November 2009, Martin revealed some of the cost overrun issues, and informed the Bank and Darling of the need for additional funds. Specifically, Martin asked Darling to raise $200,000 from his own resources, and from other Members of the Debtor, to complete the Project, assuring Darling that no further funds would be needed. At the time, Martin failed to disclose the failure to procure formal change orders, or the shifting of tenant improvement costs from Mercury to the Debtor.

Based on Martin's representations, the Debtor raised the requested additional funds from individuals who originally invested in the Project, as well as several new investors. However, these additional contributions were nowhere near enough to complete the Project. In fact, Martin's $200,000 estimate to complete the Project was a gross understatement of what was needed, in light of the undisclosed out-of-scope work, the shifting of tenant improvement costs to the Debtor, and Martin's overall mismanagement of the Project. Contractors have asserted claims against the Debtor, in litigation and otherwise, totaling $471,881.72 (although the Debtor disputes a number of those claims). Several of the unpaid contractors have asserted Statutory Liens, in the form of mechanics liens, against the Property. The Debtor has procured an estimate of the costs to complete the Project of approximately $525,000.

Despite the clear language of the Lease and Martin's responsibility for the problems plaguing the Project, Mercury brought an action in the Superior Court, Essex County against the Debtor seeking damages for the failure to complete the Project; the action is titled *Mercury Brewing and Distribution Co., Inc. v. Brewery Properties Group, LLC,* Massachusetts Superior Court, Essex County, (Civil Action No. 10-1292) (the "Rent Action"). The Debtor has filed counterclaims against Mercury in the Rent Action, seeking, *inter alia*, payment of the Rent Arrearage of $475,000. The Debtor has removed the Rent Action to the Bankruptcy Court pursuant to 11 U.S.C. 1452(a).

C.    **Transfer of the Real Estate Loan and Loan Defaults**

On or about September 1, 2010, the Bank assigned its interests in the Real Estate Loan to Soffron Holdings LLC ("Holdings"), a Massachusetts limited liability company controlled by Timothy Sheehan ("Sheehan"), an individual with extensive experience in the beer distribution

---

misrepresented the cost associated with the changes.

industry.[3]  At the same time, Sheehan, either directly or through intermediate entities, acquired control over Mercury through (i) an option to acquire a controlling share of Mercury's outstanding stock, and (ii) a proxy agreement with Martin allowing Sheehan to vote Martin's shares in Mercury.[4]

Having acquired control of both the Real Estate Loan and Mercury, Sheehan has subsequently taken steps to use Martin's mismanagement of the Project and Mercury's defaults under the Mercury Lease to wrest control of the Property from the Debtor.  On February 15, 2011, the Bank, on behalf of Holdings, sent both the Debtor and Mercury a notice of default with respect to the Real Estate Loan.  In addition, the Bank, again on behalf of Holdings, issued a payment demand to Darling; there is no evidence that a similar demand was sent to Martin.  Nor does it appear that the Bank, on behalf of Holdings, has issued default notices to Mercury with respect to the Mercury Loans, which are cross-defaulted with the Real Estate Loan.

Without the cash flow from the Mercury Lease to fund payments on the Real Estate Loan, the Debtor is not in a position to cure the defaults arising thereunder.  Absent a Chapter 11 filing, the likely result of those defaults is a foreclosure sale by the Bank for the benefit of Holdings.  A foreclosure sale will have the result of extinguishing all of the Statutory Liens, and leave the Debtor with no funds to pay any of the amounts due to the contractors that have provided services and/or materials for the Project.  And, of course, the decision to make or withhold payments under the Mercury Lease now rests with Sheehan and Holdings, who appear intent to use the lease defaults to acquire title to the Property, to the detriment of the Debtor's creditors and equityholders.

The Debtor does not intend to allow Sheehan, Holdings or Mercury to take control of the Property without further consideration.  Instead, through the Plan, the Debtor seeks to:

- Collect the $512,124.35 Rent Arrearage owed to the Debtor under the Mercury Lease;
- Raise additional capital of up to $150,000 from the Plan Funders in exchange for the issuance of the New Membership Interests;
- Reinstate the Real Estate Loan, and utilize the Rent Arrearage and the new funding to cure all outstanding payment defaults;[5]
- Utilize the Rent Arrearage and the new capital to fund the costs of completing the Project; and
- Utilize those funds to generate a 10% up-front dividend to the Holders of Allowed General Unsecured Claims.
- Pay the balance of the Allowed Claims of the Holders of General Unsecured Claims over time, from the excess of the payments of rent due under the Mercury Lease over the payments of debt service required to be made to Holdings under the Senior Loan Documents.

---

[3] The Bank continues to administer the Real Estate Loan for the benefit of Holdings, in its capacity as Trustee for the bonds evidencing the Real Estate Loan.

[4] It does not appear that Danversbank transferred its interest in the Mercury Loans to Holdings.

[5] The Plan also provides for the reinstatement of the Danversbank Guaranty.  As the Debtor is not aware that Mercury is in default under the Mercury Loans, the Plan does not provide for any payments to Danversbank on account of the Danversbank Guaranty.

The Debtor believes that its Plan will provide for its creditors a far better result than they could ever hope to obtain if Sheehan and Holdings are permitted to go forward with their foreclosure.

## III.   THE DEBTOR'S ASSETS, LIABILITIES AND BUSINESS PLAN; THE CHAPTER 11 CASE

### A.   Assets and Liabilities

As of the Petition Date, the Debtor's principal asset is the Property. Because of its current incomplete state and dispute with Mercury over the Mercury Lease, the current market value of the Property is less than the outstanding balance of the Real Estate Loan. As a result, and pursuant to Bankruptcy Code Section 506(a), creditors holding Liens on the Property that are junior in priority to the Mortgage hold General Unsecured Claims.

In addition to the Property, and as is reflected in its Schedules of Assets and Liabilites filed on the Petition Date, the Debtor holds a number of claims against parties involved in the Project which the Debtor believes will generate significant recoveries for the benefit of the Estate. Included in these claims (without in any way limiting or waiving any of the Debtor's rights and remedies, which are expressly reserved) are claims against Wardley for his mismanagement of the construction project and negligent work; claims against Hagan for failing to complete the work required under the fixed-price Construction Contract for the price set forth therein; and claims against Martin for his multiple breaches of fiduciary duty in connection with his conflicts of interest and mismanagement of the Project.

As of the Petition Date, the approximate balance outstanding under the Real Estate Loan was $2,071,469.91. Included in that balance, the Secured Claim Arrearage as of the same date was $91,469.91. The Real Estate Loan is secured by the Mortgage; in addition, as noted above, Mercury is a joint obligor with respect to the Real Estate Loan, and the Loan is guaranteed by Martin and Darling. Peter McAllister, a member of the Debtor, provided a completion guaranty for the benefit of the Bank in the amount of $250,000. The Real Estate Loan is governed and secured by the Senior Loan Documents.

The Real Estate Loan, and the rights of the Holder under the Senior Loan Documents, was assigned by Danversbank to Soffron Holdings LLC on or about September 1, 2011. The Debtor believes that, based upon its improper administration of the Real Estate Loan, the Debtor has substantial defenses to the repayment of the Real Estate Loan. The Debtor further believes that, because of its knowledge of the Debtor's defenses when it took assignment of the Real Estate Loan and its own bad-faith conduct, it holds substantial claims against Soffron Holdings as well.

Pursuant to the Danversbank Guaranty, the Debtor has guaranteed the Mercury Loans, having an aggregate principal balance of $857,300. The Debtor does not have current information concerning the outstanding balance of the Mercury Loans. On information and belief, Danversbank has not declared the existence of a default under the Mercury Loans or taken any enforcement action with respect thereto.

As of the Petition Date, the Debtor was obligated to the Town of Ipswich for real property taxes in the approximate amount of $18,124.35.[6] The Claim of the Town of Ipswich is secured by a first-priority Lien on the Property.

NYLAJO, LLC, a Massachusetts limited liability, holds a Secured Claim against the Debtor in the amount of $20,000 plus accrued and unpaid interest. The NYLAJO Claim arises from the sale by NYLAJO to the Debtor of a lot that currently comprises a portion of the Property, and is subordinated to the Soffron Secured Claim by virtue of a Subordination Agreement dated December 17, 2008. Because the value of the Property does not exceed the aggregate amount of the Claims of the Town of Ipswich and Soffron, the NYLAJO Claim will be treated as a General Unsecured Claim in Class 4 under the Plan.

A number of contractors claiming to be owed amounts relating to their work on the Project have filed Statutory Liens against the Property. These Claims – totaling eight in number and $471,881.72 in amount – will, to the extent Allowed, be treated as General Unsecured Claims in Class 4 under the Plan.

### B.   The Debtor's Business Plan

The Debtor intends to retain control over the Property, and to utilize the wrongfully withheld rent due under the Mercury Lease to fund (i) the costs to complete the renovation of the Property, (ii) the cost to cure defaults arising under the Real Estate Loan, and (iii) payment to Holders of Allowed Claims under the Plan. The Debtor believes this result to be fair and appropriate, in view of the fact that Holdings and Sheehan – who currently hold controlling interests in Mercury and the Real Estate Loan – are using those positions to create the loan defaults upon which they intend to rely to gain control over the Property. The Debtor also believes that the payments to be made to its creditors under the Plan far exceed they result that would obtain for these creditors were Sheehan and Holdings permitted to carry out their scheme to procure title to the Property.

Once the renovation of the Facility is complete, the Debtor is confident that the monthly payments that must be made by Mercury under the Lease will be sufficient to permit timely payment of debt service requirements under the Real Estate Loan for the foreseeable future.

### C.   Events During The Chapter 11 Case

The Debtor filed its petition for relief on May 3, 2011. The Debtor intends to seek confirmation of the Plan as expeditiously as practicable.

The Debtor has also filed the following pleadings in the Chapter 11 Case:

- Schedules of Assets and Liabilities;
- Statement of Financial Affairs; and

---

[6] Under the Mercury Lease, Mercury is required to pay real estate taxes accruing with respect to the Property. Accordingly, real estate tax arrearage has been included in the amount of the Rent Arrearage.

- Application for Order Authorizing Retention and Employment of Casner & Edwards, LLP as Counsel for the Debtor.

Finally, the Debtor has filed a notice of removal, pursuant to 28 U.S.C. 1452(a), in the Rent Action, and intends to seek a Final Order in the Rent Action from the Bankruptcy Court in as expeditious a manner as possible. The entry of a Final Order determining that the Rent Arrearage is not less than $512,124.35 and ordering the same to be paid to the Debtor, and the receipt by the Debtor of such amount, are both conditions to the confirmation of the Plan.

## IV.    THE PLAN OF REORGANIZATION

THE DISCUSSION OF THE PLAN SET FORTH BELOW IS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND ITS SCHEDULES, THE TERMS OF WHICH ARE CONTROLLING. HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN IN ITS ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

### A.    General Overview Of The Plan

- Payment to each Holder of an Allowed General Unsecured Claim (a) on the later of (i) the Effective Date and (ii) the date upon which the Bankruptcy Court issues a Final Order allowing such Claim, in Cash, in an amount equal to 10% of each such Allowed General Unsecured Claim, and (b) on the Final Business Day of each calendar quarter after the Effective Date (or such later date or which the Bankruptcy Court issues a Final Order allowing such Claim), such Holder's Pro Rata share of $15,000, until such Allowed Claim is paid in full.

- Except as otherwise agreed by the Holders of Allowed Administrative Expenses, Allowed Priority Claims and the Town of Ipswich Secured Claim, payment in Cash and in full to all holders of all Allowed Administrative Expenses, Allowed Priority Tax Claims and the Allowed Town of Ipswich Secured Claim.

- Payment to the Holder of the Allowed Soffron Secured Claim 100% of the Secured Claim Arrearage, in Cash, on the Effective Date of the Plan, and reinstatement of the Senior Loan Documents and all rights of the Holder thereunder.

- Reinstatement of the rights of the Holder of the Danversbank Secured Claim under the Danversbank Loan Documents.

- On the Effective Date, all Equity Interests shall be deemed cancelled and extinguished, and the holder(s) of Equity Interests will not receive any Distribution, or be entitled to retain any property or interest in property, on account of such Equity Interests.

The provisions of the Plan are discussed more fully below.

**B.**   **Classification And Treatment Of Claims**

1.   Class 1 – Secured Claim of the Town of Ipswich.

    (a)   Impairment: Class 1 is impaired by the Plan. The Holder of the Allowed Claim in Class 1 is entitled to vote to accept or reject the Plan.

    (b)   Treatment: The Holder of the Allowed Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date. Notwithstanding the foregoing, the Holder of the Town of Ipswich Secured Claim may receive such other less favorable treatment as may be agreed upon by the Town of Ipswich, on the one hand, and the Debtor, on the other.

2.   Class 2 – Secured Claim of Soffron Holdings, LLC.

    (a)   Impairment: Class 2 is not impaired by the Plan. The Holder of the Allowed Claim in Class 2 is not entitled to vote to accept or reject the Plan.

    (b)   Treatment: The Holder of the Soffron Secured Claim shall be paid 100% of the unpaid amount of the Secured Claim Arrearage in Cash on or as soon as reasonably practicable after the Effective Date. In addition, as of the Effective Date, the Senior Loan Documents, and all rights and remedies of the Soffron Lender thereunder, shall be reinstated. Without limiting the foregoing, (i) the maturity date of the Senior Loan shall be reinstated as such maturity existed before such default, and (ii) the legal, equitable, or contractual rights of the Soffron under the Soffron Loan Documents shall not be altered in any way.

3.   Class 3 – Danversbank Secured Claim.

    (a)   Impairment: Class 3 is not impaired by the Plan. The Holder of the Allowed Claim in Class 3 is not entitled to vote to accept or reject the Plan.

    (b)   Treatment: The Danversbank Loan Documents, and all rights and remedies of Danversbank thereunder, shall be reinstated. Without limiting the foregoing, the legal, equitable, or contractual rights of Danversbank under the Danversbank Loan Documents shall not be altered in any way.

4.   Class 4 – General Unsecured Claims

    (a)   Classification: Class 4 consists of General Unsecured Claims, including the NYLAJO Claim and the deficiency Claims of Holders of Statutory Liens.

(b)    Impairment: Class 4 is impaired by the Plan. The Holders of the Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

(c)    Treatment: Each Holder of an Allowed Claim in Class 3 shall receive (a) ten percent (10%) of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date, and (b) on final Business Day of the calendar quarters occurring subsequent to the Effective Date (starting with the second such calendar quarter after the Effective Date), an amount, in Cash, equal to the lesser of (i) such Holder's Pro Rata share of $15,000, or (ii) the remaining unpaid amount of such Holder's Allowed Class 4 Claim. Notwithstanding the foregoing, the Holder of an Allowed General Unsecured Claim may receive such other less favorable treatment as may be agreed to by such Holder and the Debtor. The NYLAJO Claim, and any Allowed Claim based on a deficiency Claim by a Holder of a Statutory Lien, shall become and shall be treated for all purposes under this Plan as an Allowed General Unsecured Claim and shall be classified as a Class 4 Claim

(d)    Disputed Claims: To the extent a General Unsecured Claim is not an Allowed Claim as of the later of the Effective Date and the Claims Objection Deadline, payment to the holders of Class 4 Claims shall be distributed on the basis of Class 4 Claims then Allowed. If and as additional Class 4 Claims are thereafter allowed, the Reorganized Company shall make distributions from the Disputed Claims Reserve to Holders entitled thereto as soon as practicable following entry of an Final Order of the Bankruptcy Court allowing such Class 4 Claim or agreement of the Reorganized Company and the Holder Allowing such Class 4 Claim. Holders whose Class 4 Claims are disallowed shall receive nothing pursuant to the Plan

4.    Class 5 – Membership Interests in the Debtor.

(a)    Impairment: Class 5 consists of the Interests in the Debtor.

(b)    Treatment: The Holders of Class 5 Interests will receive nothing or account of such Interests, and such Interests shall be extinguished as of the Effective Date.

## V.    **METHOD OF DISTRIBUTIONS UNDER THE PLAN**

### A.    **Responsibility For Distributions**

The Reorganized Company shall be responsible for distributions pursuant to the Plan. Neither the Reorganized Company, nor any of its employees, officers, agents, or professionals, shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the distribution provisions of the Plan and the making or

withholding of distributions pursuant to the Plan, or (ii) any change in the value of distributions made pursuant to the Plan resulting from any delays in making such distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

### B.    Issuance and Distribution of New Membership Interests

On or before the Effective Date, the Reorganized Company shall authorize and issue the New Membership Interests to be distributed to the Plan Funders pursuant to the Plan. After the Effective Date, nothing herein shall prohibit the Reorganized from issuing additional new membership interests in accordance with its certificate of incorporation and by-laws.

### C.    Disputed Claims

On the Effective Date, or as soon thereafter as is practicable, the Debtor shall create and fund the Disputed Claims Reserve, in an amount equal to 100% of distributions to which Holders of Disputed Claims would be entitled as of such date if the Disputed Claims were Allowed in their full amount. No holder of a Disputed Claim shall have any claim to distributions under the Plan until such Disputed Claim has become an Allowed Claim, and no holder of a Disputed Claim shall have the right to interest on such Disputed Claim except as otherwise provided in the Plan. Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

The Holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, pursuant to a Final Order, shall be paid from the Disputed Claims Reserve the Allowed Amount of such Claim in accordance with the Plan.

## VI.    MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Distribution to Creditors

As soon as practicable after the Effective Date, the Reorganized Company will make Cash payments to Holders of Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed General Unsecured Claims, and the Allowed Claim in Class 1. Also, the Reorganized Company will make a Cash payment to the Holder of the Allowed Secured Claim in Class 2 of an amount equal to the Secured Claim Arrearage, as determined by an agreement between the Debtor and the Holder of the Secured Claim in Class 2 or by Final Order of the Bankruptcy Court.

### B.    Sources of Cash for Plan Distribution

Except as otherwise provided in the Plan or the Confirmation Order, all funds necessary for the Debtor to make payments pursuant to the Plan shall be obtained from the Debtor's estate including the Proceeds received from the Plan Funder on the Effective Date, the Rent Arrearage and any Cash of the Debtor or the Estate as of the Effective Date.

### C.     Authorization of New Membership Interests

As of the Effective Date, the issuance of the New Membership Interests as provided in the Plan will be deemed authorized and approved by virtue of entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable State law, and without any requirement of further action by the managers or members of the Debtor or the Reorganized Company. On the Effective Date, the Plan Funders shall acquire the New Membership Interests by paying the Proceeds to the Debtor. The acquisition of the New Membership Interests shall be accomplished effective as of the Effective Date through the deemed cancellation of all certificates or other instruments representing the existing Membership Interests and the deemed issuance of all of the New Membership Interests to the Plan Funders or their nominee(s) as designated by the Plan Funders on or before the Effective Date. The New Membership Interests shall be acquired by the Plan Funders (or their nominee) free and clear of all liens, claims and encumbrances. Any securities issued pursuant to the Plan will be exempt from laws requiring registration for the offer or sale of such securities or registration or licensing of an issuer of, underwriter of, or broker or dealer in, such securities to the fullest extent allowed by Bankruptcy Code Section 1145.

### D.     Rent Action

The Debtor expects that it will be awarded judgment for the Rent Arrearage in the Rent Action, and that the Rent Arrearage will be paid to the Debtor by Mercury and utilized by the Debtor to make the payments contemplated by this Plan. The entry of a Final Order awarding judgment to the Debtor for the Rent Arrearage is a condition to the effectiveness of the Plan

### E.     Management of the Reorganized Company

On and after the Effective Date, the management and operation of the Reorganized Company shall become the responsibility of the Plan Funders or their nominees. Effective as of the Effective Date, (i) all existing directors, officers, managers and employees of the Debtor shall be deemed to have resigned, and (ii) Ronald L. Rosenfield shall be deemed appointed to serve as the manager of the Reorganized Company, whereupon he shall have the right and power in accordance with the Reorganized Company's organizational documents to appoint and/or hire such officers and employees of the Reorganized Company as he/she/they deem[s] appropriate in his sole discretion.

### F.     Executory Contracts And Unexpired Leases

### 1.     Assumption or Assumption and Assignment

(a)     Assumption And Assignment Generally. Under the Plan, effective upon the Effective Date, the Reorganized Company shall be deemed to have assumed (i) the Mercury Lease, and (ii) the executory contracts and unexpired leases that are listed in Schedule A to the Plan. The Plan Funders reserve the right to amend the list of contracts and leases to be assumed through the conclusion of the Confirmation Hearing.

(b)     Cure Payments. Schedule C to the Plan specifies the Cure Payment, if

any, that the Debtor acknowledges must be tendered in order to provide cure and compensation in accordance with Section 365(b)(1)(A) and (B) of the Bankruptcy Code. In the event that any party to a contract or lease listed on Schedule C contends that the Cure Payment amount is incorrect, such party must file with the Bankruptcy Court and serve upon counsel for the Debtor and the Short Service List a written statement and an accompanying affidavit in support thereof specifying the amounts allegedly owing under Section 365(b)(1)(A) and (B) of the Bankruptcy Code no later than the deadline established by the Bankruptcy Court in its order scheduling the Confirmation Hearing. Failure to timely file and serve such statement shall result in the determination that the Debtor's tender of the Cure Payment as specified in Schedule C shall provide cure and compensation for any and all defaults and unpaid obligations under such contract or lease, and that no other amounts are owing thereunder as of the Confirmation Date. All Cure Payments that may be required by Section 365(b)(1) of the Bankruptcy Code shall be made by the Debtor on the later of (i) thirty (30) days after the Effective Date, or as soon thereafter as is practicable, (ii) thirty (30) days after resolution by a Final Order of any dispute with respect to such Cure Payment, and (iii) such time as may otherwise be agreed by the parties to any particular contracts or leases.

     2.      **Rejection.**

          (a)     Rejection Generally. Effective upon the Effective Date, the Debtor hereby rejects all executory contracts and unexpired leases that exist between the Debtor and any other entity that are not expressly assumed by the Reorganized Company pursuant to Section 8.1 of the Plan.

          (b)     Damage Claims. All Allowed General Unsecured Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Claims in Class 3 under the Plan. All Claims arising from the rejection of executory contracts or unexpired leases under the Plan shall constitute claims against the Plan Trust and must be filed with the Bankruptcy Court within thirty (30) days after notice of the entry of the Confirmation Order. The Debtor, the Plan Trustee or the Plan Funder shall have sixty (60) days after notice of the entry of the Confirmation Order to object to any proof of claim filed pursuant to this Section 8.2(b). Any such Claims that are not filed within such time will be forever barred from assertion against the Debtor and its Estate and the Plan Trust, and shall not share in any distributions under this Plan.

     G.      **Summary Of Other Plan Provisions**

     1.      **Discharge of Indebtedness**

Except as otherwise expressly provided in the Plan or the Confirmation Order, entry of the Confirmation Order shall, subject only to occurrence of the Effective Date, constitute the complete discharge and release as against the Reorganized Company of any liability, debt, or obligation of, or claim or cause of action against, or Interest in, the Debtor or the Estate that arose before the Effective Date, including, without limitation, any Claims against the Debtor of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, any Claims against the Debtor of any other nature, including, without limitation, any interest accrued thereon from and after the Petition Date, and any equity interest in the Debtor, whether or not (i) a proof of

Claim or Interest based on such liability, debt, obligation, claim, cause of action or Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Interest is an Allowed Claim or Interest, or (iii) the Holder of such Claim or Interest has accepted the Plan.

## 2.    Objections to Claims and Estimation Of Claims

The Reorganized Company will have the right to make and file objections to Claims, Interests and Administrative Expenses, and will serve a copy of each objection upon the holder of the Claim, Interest, or Administrative Expense to which the objection is made. Notwithstanding any prior order of the Bankruptcy Court or the provisions of Bankruptcy Rule 9019, as of the Effective Date, the Reorganized Company may settle or compromise any Disputed Administrative Expense or Disputed Claim without approval of the Bankruptcy Court, provided that such settlement or compromise is evidenced by a writing signed by a duly authorized representative of the Reorganized Company.

The deadline for the Reorganized Company to file objections to Claims is the "Claims Objection Deadline," which will be the later of (i) the 30th day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Reorganized Company and the holder of such Claim.

Except as expressly provided in the Plan, the Reorganized Company reserves the right to object to any Claim and/or to seek to subordinate any Claim or to recharacterize any such Claim as an Interest.

## 3.    Exculpations and Releases

Sections 10.02 and 10.05 of the Plan contain provisions that set forth the standard of liability for various persons and entities in connection with the Chapter 11 Case. These provisions will affect creditors, equity security holders, and other parties. Interested parties are encouraged to read the entirety of these Sections, which are summarized herein.

Section 10.02 of the Plan provides that neither the Debtors, the Reorganized Company, nor the Committee, nor any of their employees, officers, directors, members, agents, or representatives employed as of the Confirmation Date, nor any professional person employed by any of the foregoing, will have or incur any liability to any person or entity for any act taken or omission made in connection with or related to negotiating, formulating, implementing, confirming, or consummating the Plan, the Disclosure Statement, or any contract, instrument, security, release, or other agreement, instrument, or document created in connection therewith, except for willful misconduct or gross negligence. As specified in Section 1125(e) of the Bankruptcy Code, Section 10.05 of the Plan provides that entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, will not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

4.   **Preservation of the Debtors' Rights and Defenses**

As provided more fully in Section 13.02 of the Plan, and except to the extent such rights, claims, causes of action, defenses, and counterclaims are expressly and specifically released in connection with the Plan or in any settlement agreement approved during the Chapter 11 Case, (i) any and all rights, claims, causes of action, defenses, and counterclaims accruing to the Debtor or its estate (including, without limitation, Avoidance Power Causes Of Action and Project Claims) shall vest in the Debtor, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, causes of action, defenses, and counterclaims have been Scheduled or otherwise listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, and (ii) the Debtor does not waive, relinquish, or abandon (nor shall the Debtor be estopped or otherwise precluded from asserting) any right, claim, cause of action, defense, or counterclaim that constitutes property of the Debtor's estate, (a) whether or not such right, claim, cause of action, defense or counterclaim has been listed or referred to in the Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such right, claim, cause of action, defense, or counterclaim is currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such right, claim, cause of action, defense, or counterclaim filed a proof of claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against this Plan, or received or retained any consideration under this Plan. Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, claim, cause of action, defense, or counterclaim, or potential right, claim, cause of action, defense, or counterclaim in the Debtor's Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, shall in no manner waive, eliminate, modify, release, or alter the Debtor's right to commence, prosecute, defend against, settle, and realize upon any rights, claims, causes of action, defenses, or counterclaims that the Debtor has or may have as of the Confirmation Date. The Debtor may commence, prosecute, defend against, recover on account of, and settle all rights, claims, causes of action, defenses, and counterclaims in its sole discretion in accordance with what is in the best interests, and for the benefit, of the beneficiaries of the Debtor.

5.   **Revesting Of Assets**

In accordance with Bankruptcy Code Section 1141(b), Section 5.03(b) of the Plan provides that, except as otherwise provided in the Plan, property of the Debtor's Estate will revest in the Reorganized Company on the Effective Date. Thereafter, the Reorganized Company may operate its business and may use, acquire, and dispose of property without supervision by the Bankruptcy Court or the United States Trustee and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. As of the Effective Date, the Reorganized Company's property will be free and clear of all Claims, Liens, encumbrances, or other interests of creditors and Interest holders, except as otherwise provided in the Plan.

## 6.    Implementation Of Bankruptcy Code Section 1146(c)

Any transfers or other transactions that occur pursuant to or in connection with the Plan or the Confirmation Order will be exempt from tax under any federal, State, or local law imposing a stamp tax, real estate transfer tax, recording tax, or similar tax.

## 7.    Retention Of Jurisdiction

Article XII of the Plan generally provides for the retention of jurisdiction by the Bankruptcy Court for the purposes of among other things, (i) determining disputes relating to Administrative Expenses, Claims and Interests, (ii) hearing adversary proceedings, contested matters, and other proceedings relating to Avoidance Power Causes of Action, the assumption or rejection of executory contracts and unexpired leases, and other matters affecting the Chapter 11 Case, the Plan, and the administration of the Debtor's Estate, (iii) enforcing the Debtor's discharge, and (iv) all other issues presented by or arising under the interpretation, implementation, or enforcement of the Plan or the Confirmation Order.

## 8.    Conditions Precedent

Pursuant to Article IX of the Plan, the Plan's effectiveness is subject to a number of conditions precedent. In particular, the Plan will not become effective until each of the following conditions, among others, has been satisfied or waived by the Plan Funders:

(i)     the Confirmation Order shall have been entered on the docket of the Bankruptcy Court in the Chapter 11 Case for at least ten (10) days (as calculated in accordance with Bankruptcy Rule 9006(a));

(ii)    the Confirmation Order shall have been entered and no stay of the Confirmation Order shall be in effect;

(iii)   a Final Order determining that the amount of the Rent Arrearage is not less than $512,124.35, and awarding judgment to the Debtor for said amount, without setoff, reduction or counterclaim, shall have been entered in the Rent Action; and

(iv)    The Rent Arrearage, in an amount not less than $512.124.35 shall have been received by the Debtor.

## 9.    Effective Date

The Plan's Effective Date will occur on the first Business Day after the date that the Confirmation Order becomes a Final Order Date, or such other date as may reasonably be agreed to by the Debtor and the Plan Funder.

As soon as practicable after the Effective Date has occurred, the Reorganized Company will file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

**H.**   **Fair And Equitable Treatment**

The Plan may be confirmed over the dissenting vote of certain classes of creditors pursuant to Section 1129(b) of the Bankruptcy Code. If any impaired Class of Claims or Interests entitled to vote on the Plan fails to accept the Plan, the Debtor will request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b).

## VII.   FINANCIAL PROJECTIONS

Attached to this Disclosure Statement as <u>Exhibit B</u> are financial projections (the "Projections"), prepared by the Debtor, that show the Debtor's ability to make the distributions provided for under the Plan. The Projections incorporate (i) the payments to be made by the Debtor under the Plan (which are, in turn, based on the Debtor's estimate of the Allowed Claims against the Debtor), (ii) the projected costs required to complete the renovation of the Facility (the "Completion Costs"), and (iii) the administrative expenses that the Debtor estimates will be required in connection with the Chapter 11 Case. The Completion Costs were estimated by D&H Construction Co., Inc. (the "Construction Consultant"), after a review of the Plans and an inspection of the Facility.

The Projections make clear that the Rent Arrearage, the Proceeds and the Debtor's Cash will be sufficient to make the payments required under the Plan.

As noted previously, the Projections are by their nature forward looking, and contain estimates, assumptions, and projections that may be materially different from actual, future results.

## VIII.   CERTAIN TAX CONSEQUENCES OF THE PLAN

Because the tax consequences of the Plan may vary based on individual circumstances, each holder of a Claim or Interest is urged to consult with its own tax advisor as to the consequences of the Plan to it under federal and applicable state, local, and foreign tax laws.

## IX.   VOTING PROCEDURES; BAR DATES; CONFIRMATION HEARING

### 1.   Time and Place of the Confirmation Hearing

The Plan cannot become effective until after the Bankruptcy Court has confirmed it and the conditions to the Effective Date set forth in the Plan have either been satisfied or waived.

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will take place on _____ ,2011 at _____ , Eastern Time, before the Honorable Joan N. Feeney, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Massachusetts, Eastern Division, in Courtroom #__, 12th Floor, John W. McCormack Post Office and Courthouse, 5 Post Office Square, Boston, Massachusetts 02109. The Confirmation Hearing may be continued from time to time without further notice, except as announced in open Court.

### 2.    Voting Instructions

A Ballot to be used for voting to accept or reject the Plan is enclosed with all copies of this Disclosure Statement mailed to all persons entitled to vote. Each holder of a Claim is entitled to vote, provided that either (a) its claim has been scheduled by the Debtors and such claim is not scheduled as disputed, contingent, or unliquidated, or (b) it has filed a proof of claim on or before the date set by the Bankruptcy Court as the last date for filing proofs of claim in this Chapter 11 Case, but in any event not later than the business date before the date set for a hearing on confirmation of the Plan, unless its claim is disallowed for voting purposes by the Bankruptcy Court.

Completed Ballots should be returned to:

Michael J. Goldberg, Esq.
CASNER & EDWARDS, LLP
303 Congress Street
Boston, MA 02210

**BALLOTS MUST BE RECEIVED ON OR BEFORE 4:30 P.M., BOSTON TIME ON_____,2011. ANY BALLOT RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM OR AN INTEREST, BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, SHALL BE DEEMED AN ACCEPTANCE.**

### 3.    Claim Amount on the Ballot

On each Ballot there is a space in which each creditor may write the amount of such creditor's claim. If the Claim amount submitted differs from the amount of the Claim as shown on the Schedules or as allowed by Final Order of the Bankruptcy Court, then the dollar amount of such Claim for voting and distribution purposes shall be determined first, by reference to the Final Order allowing such Claim, or, if no such order has been entered, by the amount specified in a timely filed proof of Claim, or if no such proof of Claim has been filed, then as determined by Debtors' Schedules.

A Ballot cast with respect to the Plan does not result in the filing or allowance of a Claim. Nor does the casting of a Ballot relieve a creditor of the obligation to file timely a proof of claim. The Reorganized Company reserves the right to object to any Claims until the deadline imposed by the Plan, as such deadline may be extended as provided in the Plan or by the Court.

### 4.    Deadline for Objecting to Confirmation of the Plan

All creditors and stockholders are entitled to be heard with respect to confirmation of the Plan, even if they are not eligible to vote to accept or reject the Plan. Objections to confirmation of the Plan must be filed with the Bankruptcy Court by 4:30 p.m., Eastern

Time, on _____, 2011 and served so as to be received on that date by (i) counsel for the Debtors, Casner & Edwards, LLP, 303 Congress Street, Boston, Massachusetts 02210, Attention: Michael Goldberg, Esq.; and (ii) the Office of the United States Trustee for the District of Massachusetts, Eastern Division, John W. McCormack Post Office and Courthouse, 5 Post Office Square, Boston, Massachusetts 02109, Attention: _____.

**5.     Deadlines for Parties to Executory Contracts and Unexpired Leases to Assert Damage Claims, to Object to Terms of Assumption or Assumption and Assignment, and to State Proposed Cure Amounts**

Bankruptcy Code Section 365 allows the Debtors to assume, assume and assign to a third party, or reject executory contracts and unexpired leases to which one or more of the Debtors was party as of the Petition Date. In order to assume, or assume and assign, a contract or lease, the Debtors must "cure" certain outstanding defaults. In the event that the Reorganized Company rejects a contract or lease, the contract or lease is deemed to have been breached by the Debtors as of the Petition Date, and the non-debtor party to that contract or lease may be entitled to a Claim for damages for such breach.

**(a)     Agreements to be Assumed or Assumed and Assigned**

Under the Plan, the Reorganized Company will assume, assume and assign, or reject each executory contract and unexpired real or personal property lease to which it is a party, unless the Debtors already have done so during the pendency of this Chapter 11 case with respect to a particular contract or lease or has a motion for such relief pending at the time of confirmation, or the Bankruptcy Court has otherwise granted the Debtors or the Reorganized Company addition time. If the Reorganized Company intends to assume, or assume and assign, a contract or lease, the Debtor will file with the Court and serve on parties in interest ten (10) days prior to the Confirmation Hearing Schedule A to assume, or to assume and assign, a contract or lease. Schedule A to the Plan will include the Debtor's proposed amount to "cure" any arrearages and defaults under the relevant contract or lease ("Cure Payment"). These notices also may indicate that the Reorganized Company's assumption, or assumption and assignment, of the respective contract or lease is conditioned upon a voluntary reduction of the Cure Payment. If the assumption, or assumption and assignment, of the contract or lease is conditional upon a voluntary reduction in the Cure Payment, the contract or lease will be rejected if the respective non-debtor contracting party timely objects to the Reorganized Company's proposed Cure Payment and the parties are unable to resolve any differences or the Bankruptcy Court fixes the Cure Payment in an amount not acceptable to the Debtor.

> **Objection Deadline: Any contracting party wishing to object to the treatment proposed by the Debtor, including rejection, assumption, assumption and assignment, or the proposed Cure Payment, must file an objection with the Bankruptcy Court by 4:30 p.m. on _____, 2011, Eastern Time, five (5) days prior to the Confirmation Hearing, and serve copies thereof on counsel for the Debtor, Michael J. Goldberg, Esq., Casner & Edwards, LLP, 303 Congress**

Street, Boston, MA 02210, as to be received by that date, or
be forever barred from objecting to the treatment proposed
by the Debtor.

(b)    Agreements To Be Rejected

All contracts and leases that are not expressly assumed, or assumed and assigned, under
the Plan, and that were not previously assumed, or assumed and assigned, in the Debtors'
Chapter 11 Case, will be deemed rejected as of the Plan's Effective Date, unless the Bankruptcy
Court has granted the Reorganized Company additional time to assume or reject such contract or
lease.

Objection Deadlines: The deadline for filing Claims for
damages resulting from the rejection of executory contracts
and unexpired leases pursuant to the Plan is thirty (30) days
after the earlier of (a) entry of the Court order expressly
authorizing rejection of such contract or lease, and (b) the
mailing of notice of confirmation of the Plan.

Failure to comply with applicable deadlines shall forever bar the holder of
a Claim from seeking payment thereof.

6.    Administrative Expenses Bar Date

All parties seeking payment of Administrative Expenses (including professionals seeking
compensation under Bankruptcy Code Sections 330 and 331, parties seeking compensation for
costs incurred in making a "substantial contribution" under Section 503 of the Bankruptcy Code,
and taxing authorities) must file with the Bankruptcy Court and serve upon the Reorganized
Company a request for payment of such Administrative Expense prior to the applicable deadline
set forth below, provided, however, that parties seeking payment of post-petition ordinary course
trade obligations, post-petition payroll obligations incurred in the ordinary course of the Debtors'
postpetition business and amounts arising under agreements approved by the Bankruptcy Court
or the Plan need not file such a request.

General Deadline: The deadline for all Persons other than
governmental claimants including professionals seeking
compensation under Bankruptcy Code Section 330 and 331
to file requests for payment of Administrative Expense is
thirty (30) days after the Plan's Effective Date.

Governmental Deadline: All requests for payment of
Administrative Expenses by governmental units for taxes
(and for interest and/or penalties related to such taxes) for
any tax year or period, all or any portion of which occurs or
falls within the period from and including the Petition Date

> through and including the Effective Date and for which no
> bar date has otherwise been previously established, must be
> filed and served on counsel for the Debtor, Michael J.
> Goldberg, Esq., Casner & Edwards, LLP, 303 Congress
> Street, Boston, MA 02210, on or before the later of (i) sixty
> (60) days after the Effective Date, and (ii) one hundred
> twenty (120) days after the Reorganized Company's filing of
> tax return for such taxes.

**Failure to comply with these deadlines shall forever bar the holder of an Administrative Expense from seeking payment thereof.**

### 7.    Materials To Be Filed In Support Of Confirmation

Among other documents that the Debtor will file in support of confirmation of this Plan, the Debtor will file and serve Plan <u>Schedule A</u> listing agreements to be assumed or assumed and assigned, and the amounts the Cure Payments, if any, the Reorganized Company proposes to pay no later than ten (10) days prior to the Confirmation Hearing.

### 8.    Whom To Contact To Obtain More Information Regarding The Plan

Any interested party desiring further information about the Plan should contact in writing Casner & Edwards, LLP, 303 Congress Street, Boston, MA 02210, Attention: Michael J. Goldberg, Esq.

## X.    PLAN ALTERNATIVES/LIQUIDATION ANALYSIS

The Debtor believes that the Plan provides holders of Claims with the potential for the greatest realization on those Claims. As is described in greater detail below, the Debtor also believes that no other realistic alternative to the Plan would provide creditors with meaningful distributions on account of their claims.

Were the Plan not to be confirmed and, in the event no competing plan were proposed, the likely alternative would be for Holdings to obtain relief from the automatic stay to foreclose its mortgage on the Property. Were that to occur, the Statutory Liens would be extinguished, and the Debtor would have no funds with which to make any payments to creditors on account of their Claims. Thus, in the foreclosure scenario, the Debtor's creditors would receive nothing on account of their Claims.

In sum, based upon the Debtor's analysis of the likely alternatives to confirmation of the Plan, the Debtor believes that the Plan represents the highest available recovery for the Debtors' creditors, and a far better result than a foreclosure by Holdings – which would leave nothing to be paid to holders of General Unsecured Claims.

DATED: May ___, 2011                    BREWERY PROPERTIES GROUP, LLC


                                        By: _____
                                            Its Manager

# EXHIBIT A

## Debtor's Chapter 11 Plan

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| BREWERY PROPERTIES GROUP, LLC, | ) | Case No. 11-14208-JNF |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S CHAPTER 11 PLAN

Brewery Properties Group, LLC, the debtor and debtor-in-possession in this Chapter 11 case (the "Debtor") hereby proposes this Plan pursuant to Section 1121 of the Bankruptcy Code (the "Plan"). The Disclosure Statement that accompanies this Plan discusses the Debtor's history, business and assets, and contains a summary and discussion of this Plan. Holders of Claims and Interests and parties to executory contracts and unexpired leases are encouraged to read the Disclosure Statement. No solicitation materials other than the Disclosure Statement and related materials transmitted therewith have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of this Plan. To the extent there may be any inconsistency between the Plan and the Disclosure Statement, the Plan shall control.

### ARTICLE I.   DEFINITIONS & RULES OF INTERPRETATION

**1.01   Definitions**

As used herein, the following terms have the respective meanings specified below, subject to the rules of interpretation set forth in Section 1.02 hereof:

**"Administrative Claim"** means any Claim for any cost or expense of administration of the Chapter 11 Case allowable under Sections 330, 331, 503(b), or 507(a)(1) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor; (b) all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Sections 330, 331, or 503 of the Bankruptcy Code; and (c) all fees and charges assessed against the Estate pursuant to Section 1930 of Title 28 of the United States Code.

**"Allowed"** means, with respect to any Claim or Interest, an Allowed Claim or Allowed Interest in a particular Class or category specified. Any reference herein to a particular Allowed Claim includes both the secured (if any) and unsecured portions of such Claim.

**"Allowed Claim"** means, except as otherwise provided in this Plan, a Claim to the extent that all three of the following conditions apply:

a proof of claim was timely and properly filed or, if no proof of claim was filed, the Claim is listed by the Debtor on its Schedules as liquidated in amount and not disputed or contingent;

no objection to the allowance of the Claim or request to estimate the Claim has been interposed on or before the Claims Objection Deadline, or if any timely objection or request for estimation has been interposed, such Claim has been determined by a Final Order to be allowed in favor of the respective Holder by such Final Order (in which case the Allowed Claim shall equal the allowed amount as determined by such Final Order); and

the Claim is not otherwise a Disputed Claim.

Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claim" shall not include interest, fees (including but not limited to late charges and attorneys fees), or penalties on such Claim accruing after the Petition Date.

**"Allowed \_\_\_\_ Claim" or "Allowed Class \_\_\_\_ Claim"** means a Claim of the type specified or in the Class specified that is also an Allowed Claim (e.g., an Allowed Class 3 Claim is a Claim classified in Class 3 that is also an Allowed Claim).

**"Avoidance Rights of Action"** means all Rights of Action arising under Sections 544-551 of the Bankruptcy Code.

**"Avoidance Power Cause of Action"** means any actions commenced, or that may be commenced before or after the Effective Date in the Chapter 11 Case, pursuant to Sections 544-551 of the Bankruptcy Code.

**"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as now in effect or hereafter amended.

**"Bankruptcy Court" or "Court"** means the United States Bankruptcy Court for the District of Massachusetts, having jurisdiction over the Chapter 11 Case or any other court with jurisdiction over the Chapter 11 Case.

**"Bankruptcy Rules"** means, collectively, as now in effect or hereafter amended and as applicable in the Chapter 11 Case, (i) the Federal Rules of Bankruptcy Procedure and (ii) the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Massachusetts.

**"Brewery Properties Group, LLC"** means the above-named Chapter 11 Debtor, Brewery Properties Group, LLC.

**"Building"** means the building located on the Premises.

**"Business Day"** means any day that is not a Saturday, a Sunday, or a "legal holiday" as defined in Bankruptcy Rule 9006(a).

**"Cash"** means legal tender of the United States of America and equivalent thereof.

"**Chapter 11 Case**" means *In re Brewery Properties Group, LLC*, Chapter 11 Case, No. 11-14208-JNF, pending in the Bankruptcy Court.

"**Claim**" means a claim against the Debtor, whether or not asserted, known or unknown, as such term is defined in Section 101(5) of the Bankruptcy Code.

"**Claims Objection Deadline**" means the later of (i) the thirtieth (30th) day after the Effective Date or (ii) such later date established by the Bankruptcy Court or by agreement between the Debtor and the Holder of a Claim.

"**Class**" means any group of Claims or Interests classified by this Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

"**Class 4 Distribution**" means, on any Subsequent Distribution Date, the sum of $15,000.

"**Confirmation Date**" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

"**Confirmation Hearing**" means the hearing on confirmation of the Plan.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

"**Creditor**" means any Person who is the Holder of a Claim against the Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

"**Cure Payment**" means the amount that the Estate must tender to contract a counterparty in order to provide cure and compensation in accordance with Section 365(b)(1)(A) & (B) of the Bankruptcy Code.

"**Danversbank**" means Danversbank, a Massachusetts stock savings bank.

"**Danversbank Guaranty Claim**" means the Secured Claim of Danversbank, as evidenced and/or secured by the Danversbank Loan Documents.

"**Danversbank Loan Documents**" means that certain Unlimited Guaranty of the obligations of Mercury given by the Debtor to Danversbank, and all other instruments and documents evidencing and/or securing the Danversbank Secured Claim.

"**Debtor**" means the above-named Chapter 11 Debtor, Brewery Properties Group, LLC, including in its capacity as the Reorganized Company as of and after the Effective Date.

"**Disclosure Statement**" means the disclosure statement relating to this Plan including, without limitation, all annexes and schedules thereto, as approved by the Bankruptcy Court

pursuant to Section 1125 of the Bankruptcy Code as the same may be amended, modified or supplemented.

**"Disputed Claim"** means a Claim as to which any one of the following applies: (i) no proof of claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules, or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, or unknown; (ii) the Claim is the subject of a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the Plan filed on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a Final Order; (iii) the Holder of the Claim is a defendant in a pending Avoidance Power Cause of Action, or has failed to pay or turn over property as required by Section 502(d) of the Bankruptcy Code; or (iv) the Claim is otherwise treated as a "Disputed Claim" pursuant to this Plan.

**"Disputed Claims Reserve"** means in the event there exists any Disputed Claim on or after the Effective Date (including on any Subsequent Distribution Date), Cash to be set aside by the Debtor in amounts sufficient to fund distributions on account of such Disputed Claims in accordance with the provisions of the Plan, if such Disputed Claims become Allowed Claims, and to be maintained under the Plan, as set forth more fully in Article 11 of the Plan.

**"Effective Date"** means the first Business Day after the date that the Confirmation Order becomes a Final Order, or such other date as may reasonably be agreed to by the Debtor and the Plan Funder.

**"Estate"** means the estate created in the Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

**"Final Order"** means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, to petition for certiorari, or to move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari, reargument, or rehearing has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired.

**"General Unsecured Claim"** means any Claim against the Debtor that is not an Administrative Claim, Priority Tax Claim or Secured Claim. General Unsecured Claims shall include, without limitation, any and all unsecured trade, contribution, indemnification, reimbursement, if any, employee contract, unsecured deficiency Claims, (including without limitation unsecured deficiency Claims secured by Statutory Liens) and lease and contract rejection Claims against the Debtor.

"**Holder(s)**" means the beneficial owner(s) of any Claim or Interest, which, in the case of an investment company, shall be the investment company and not its Shareholders, and which, in the case of an insurance company, shall be the insurance company and not its insured.

"**Impaired**" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**Interest**" means an equity security, within the meaning of Section 101(16) of the Bankruptcy Code, in the Debtor, including but not limited to the Membership Interests.

"**Lien**" means a "lien" as defined in Section 101(37) of the Bankruptcy Code; except that a lien that has been avoided in accordance with Section 544, 545, 546, 547, 548, 549, or 553 of the Bankruptcy Code shall not constitute a Lien.

"**Martin**" means Robert Martin, the President of Mercury and former co-manager of the Debtor.

"**Membership Interests**" means all of the outstanding membership interests in the Debtor prior to the Effective Date.

"**Mercury**" means Mercury Brewing and Distribution Co., Inc., a Massachusetts corporation, and the tenant under the Mercury Lease.

"**Mercury Lease**" means the lease between the Debtor and Mercury dated as of November 1, 2005, pursuant to which Mercury leases the Premises from the Debtor.

"**New Membership Interests**" means the membership interests in the Reorganized Company to be issued on the Effective Date following the cancellation of the existing Membership Interests.

"**NYLAJO**" means NYLAJO, LLC, a Massachusetts limited liability company.

"**NYLAJO Claim**" means the Claim of NYLAJO arising under that certain Promissory Note and Mortgage dated as of December 17, 2008, which Claim is subordinate to the Soffron Secured Claim pursuant to that certain Subordination Agreement dated as of December 17, 2008.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, trust, joint-stock company, business trust, unincorporated association or organization, governmental agency, or political subdivision thereof, committee or other entity of whatever nature.

"**Petition Date**" means May 3, 2011, the date on which the Debtor filed its voluntary petition for relief commencing this Chapter 11 Case.

"**Plan**" means this Chapter 11 plan of reorganization, including all exhibits hereto and all documents incorporated by reference herein or contained in the Plan Documentary Supplement, either in their present form or as they may be amended, supplemented, restated, or otherwise

modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and this Plan.

"**Plan Documentary Supplement**" means any compilation of the forms and summaries of certain documents, as the same may be amended, supplemented, restated, or otherwise modified from time to time, that the Debtor may file in connection with this Plan.

"**Plan Funder**" means, collectively, Marla Darling, George Darling, Scott Stikeleather, Ronald Rosenfield and Matthew Pieniazek, all of whom were Holders of Interests in the Debtor as of the Petition Date.

"**Premises**" means the land owned by the Debtor, containing approximately 1.44 acres, with the improvements thereon located in Ipswich, Massachusetts, known as and numbered as 2 Soffron Lane, as more particularly described on Schedule B to the Plan, together with all improvements, easements, rights of way, sewer rights, water rights and other rights appurtenant thereto or used in connection therewith.

"**Priority Tax Claim**" means a Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

"**Proceeds**" means the up to $150,000 to be paid on the Effective Date by the Plan Funder to acquire the New Membership Interests.

"**Project**" means the acquisition, financing, design, construction, leasing, permitting and landscaping of the Premises and the Building, including without limitation the supervision of the renovation of the base Building shell and the installation of tenant improvements and equipment therein, the negotiation of the financing for the renovation of the Building, the administration of the Senior Loan, the enforcement of the Debtor's rights under the Mercury Lease, and the management of the Debtor.

"**Project Claims**" means any claims, causes of action, defenses, and counterclaims accruing to the Debtor or the Estate arising out of or in connection with the Project, including without limitation the claims, causes of action, defenses and counterclaims described on Schedule A to this Plan.

"**Pro Rata**" means proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the allowed amount of the Allowed Claim is the same as the ratio of (x) the amount of consideration available for distribution on account of all Allowed Claims in such Class in which the particular Allowed Claim is included to (y) the amount of all Claims (whether Allowed Claims or Disputed Claims) in that Class.

"**Released Party**" means (i) Debtor and any manager (except Martin), member (except Martin), agent, representative, employee benefit plan fiduciary, employee benefit plan administrator, employee, attorney, accountant, financial advisor or other professional of the Debtor, but only if and to the extent, in each case, that such party served in such capacity on or after the Petition Date, and (ii) the Plan Funders, and any of their respective current or former officers, directors, employees, attorneys, accountants, advisors, representatives, agents, or assignees.

"**Rent Action**" means the action titled *Mercury Brewing and Distribution Co., Inc. v. Brewery Properties Group, LLC,* Massachusetts Superior Court, Essex County, (Civil Action No. 10-1292), removed to the Bankruptcy Court by notice of removal dated May 4, 2011.

"**Rent Arrearage**" means the accrued rent payable, but not yet paid, under the Mercury Lease in the amount of $512.124.35 as of the Petition Date, plus all installments of rent becoming due under the Mercury Lease after the Petition Date to the extent that they have not been paid by Mercury, together with any related damages, fees, costs or interest that may be payable under the Mercury Lease, or such other amount as is determined by the Bankruptcy Court to be due to the Debtor under the Mercury Lease, including without limitation through adjudication of the Rent Action.

"**Reorganized Company**" means the Debtor, Brewery Properties Group, LLC, as reorganized and restructured under this Plan as of the Effective Date.

"**Rights of Action**" means any and all claims, demands, rights, defenses, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets, powers and privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by any of the Debtor or the Estate against any Person, including but not limited to: (i) rights of setoff, counterclaim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (ii) the right to object to Claims; (iii) such claims and defenses as fraud, mistake, duress and usury; (iv) all Avoidance Rights of Action; and (v) the Contractor Claims.

"**Schedules**" means the schedules of assets and liabilities, list of equity security Holders, and the statement of affairs filed by the Debtor as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rule 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

"**Secured Claim**" means a Claim secured by a Lien, a Statutory Lien or right of setoff, but only to the extent (a) entitled to secured status under Section 506(a) of the Bankruptcy Code, and (b) such Lien, Statutory Lien or right of setoff is not avoidable under the Bankruptcy Code or applicable non-bankruptcy law.

"**Secured Claim Arrearage**" means all amounts determined by Final Order of the Court to be required to cure any monetary defaults under the Senior Loan Documents as of the Confirmation Date.

"**Senior Loan**" means the loan evidenced and/or secured by the Senior Loan Documents.

"**Senior Loan Documents**" means the instruments and documents evidencing and/or securing the Soffron Secured Claim.

"**Soffron**" means Soffron Holdings LLC, a Massachusetts limited liability company.

"**Soffron Secured Claim**" means the Secured Claim of Soffron, as evidenced and/or secured by the Senior Loan Documents.

"**State**" means The Commonwealth of Massachusetts.

"**Statutory Lien**" shall have the meaning set forth in Section 101(53) of the Bankruptcy Code.

"**Subsequent Distribution Date**" means the final Business Day of the calendar quarters occurring after the Effective Date, with the first such Subsequent Distribution Date occurring on the final Business Day of the second calendar quarter after the Effective Date, and the last such Subsequent Distribution Date occurring on the date that all amounts due to the Holders of Allowed Class 4 Claims under this Plan have been in full.

"**Town of Ipswich**" means the Town of Ipswich, Massachusetts.

"**Town of Ipswich Secured Claim**" means the Secured Claim of the Town of Ipswich for real property taxes due and payable with respect to the Premises.

"**Unclaimed Distribution Reserve**" is defined in Section 7.04(b).

"**Unimpaired**" means, when used in reference to a Claim or Interest, a Claim or Interest that is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.02    Rules of Interpretation.** For purposes of this Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) any reference in the Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (iii) any reference in the Plan to a document, schedule, annex, or exhibit to the Plan, Plan Documentary Supplement, or Disclosure Statement filed or to be filed means such document, schedule, annex, or exhibit, as it may have been or may be amended, modified, or supplemented; (iv) unless otherwise specified, all references in the Plan to articles, sections, subsections, clauses, paragraphs, schedules, and exhibits are references to articles, sections, subsections, clauses, paragraphs, schedules, and exhibits of or to the Plan; (v) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, clause, or paragraph contained in the Plan; (vi) a term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or Bankruptcy Rules; and (vii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or any other provision in this Section 1.02.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

**1.03    Documentary Supplement.** Certain documents referred to herein are contained in a separate Plan Documentary Supplement, which the Debtor shall file with the Bankruptcy Court and amend from time to time prior to the Effective Date. All exhibits to the Plan and all documents contained in the Plan Documentary Supplement are incorporated into and are a part of the Plan as if set forth in full herein.

**ARTICLE II.   TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**

Administrative Claims and Priority Tax Claims have not been classified and are excluded from the Classes set forth in Article III in accordance with Section 1123(a)(1) of the Bankruptcy Code.

**2.01   Administrative Claims.**  Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim shall be paid 100% of the unpaid allowed amount of such Administrative Claim in Cash on or as soon as reasonably practicable after the Effective Date. Notwithstanding the immediately preceding sentence: (i) any Administrative Claims for goods sold or services rendered representing liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case involving trade, service or vendor Claims, subject to compliance with any applicable bar date, shall be paid by the Debtor in the ordinary course in accordance with the terms and conditions of any agreements relating thereto; and (ii) Administrative Claims of the United States Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6) shall be paid in accordance with the applicable schedule for payment of such fees.

**2.02   Priority Tax Claims.**  Each Holder of an Allowed Priority Tax Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date.  Any claim or demand for penalty relating to any Priority Tax Claim shall be disallowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Released Parties, the Debtor's directors and officers, the Debtor's successor(s), or its property.  Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim may receive such other less favorable treatment as may be agreed upon by the claimant and the Debtor.

**ARTICLE III.   TREATMENT OF CLAIMS AND INTERESTS**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims as described in Article II, have not been classified and thus are excluded from the Classes that follow.  The following table designates the Classes of Claims and specifies which of those Classes are (i) Impaired or Unimpaired by this Plan, and (ii) entitled to vote to accept or reject this Plan in accordance with Section 1126 of the Bankruptcy Code or deemed to reject this Plan.

**3.01   Classes**

| Class | Composition | Status |
|-------|-------------|--------|
| 1. | Town of Ipswich Secured Claim | Impaired - Entitled to Vote |
| 2. | Soffron Secured Claim | Unimpaired - Not Entitled to Vote (Deemed to Accept Plan) |
| 3. | Danversbank Secured Claim | Unimpaired – Not Entitled to Vote (Deemed to Accept Plan) |

| 4. | General Unsecured Claims | Impaired - Entitled to Vote |
| 5. | Interests | Impaired - Entitled to Vote (Deemed to Reject Plan) |

**3.02     General Rules of Classification**. Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim has not been paid, released or otherwise satisfied and qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes. For voting purposes, a Holder of more than one Claim in a Class shall be deemed to have a single Claim in such Class in the aggregate amount of such Holder's Claims in such Class.

### ARTICLE IV.     TREATMENT OF CLAIMS AND INTERESTS

**4.01     Town of Ipswich Secured Claim (Class 1)** . Class 1 is impaired by this Plan. The Holder of the Allowed Claim in Class 1 is entitled to vote to accept or reject this Plan.

The Holder of the Allowed Claim shall be paid 100% of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date. Notwithstanding the foregoing, the Holder of the Town of Ipswich Secured Claim may receive such other less favorable treatment as may be agreed upon by the Town of Ipswich, on the one hand, and the Debtor, on the other.

**4.02     Soffron Secured Claim (Class 2)**.  Class 2 is not impaired by this Plan and is therefore deemed to accept the Plan and is not entitled to vote on the Plan.

The Holder of the Soffron Secured Claim shall be paid 100% of the unpaid amount of the Secured Claim Arrearage in Cash on or as soon as reasonably practicable after the Effective Date.  In addition, as of the Effective Date, and after giving effect to payment of the Secured Claim Arrearage, the Senior Loan Documents, and all rights and remedies of Soffron thereunder, shall be reinstated. Without limiting the foregoing, (i) the maturity date of the Senior Loan shall be reinstated as such maturity existed before such default, and (ii) the legal, equitable, or contractual rights of Soffron under the Senior Loan Documents shall not be altered in any way.

Notwithstanding the foregoing, the Holder of the Soffron Secured Claim may receive such other less favorable treatment as may be agreed upon by Soffron, on the one hand, and the Debtor, on the other.

**4.03     Danversbank Secured Claim (Class 3).**  Class 3 is not impaired by this Plan and is therefore not entitled to vote to accept or reject this Plan.

The Danversbank Loan Documents, and all rights and remedies of Danversbank thereunder, shall be reinstated.  Without limiting the foregoing, the legal, equitable, or contractual rights of Danversbank under the Danversbank Loan Documents shall not be altered in any way.

Notwithstanding the foregoing, the Holder of the Danversbank Secured Claim may receive such other less favorable treatment as may be agreed upon by Danversbank, on the one hand, and the Debtor, on the other.

**4.04    General Unsecured Claims (Class 4)**.  Class 4 is impaired by this Plan.  The Holders of an Allowed General Unsecured Claim in Class 4 is entitled to vote to accept or reject the Plan.

Each Holder of an Allowed Claim in Class 4 shall receive (a) ten percent (10%) of the unpaid amount of such Allowed Claim in Cash on or as soon as reasonably practicable after the Effective Date, and (b) on each Subsequent Distribution Date, an amount, in Cash, equal to the lesser of (i) such Holder's Pro Rata share of the Class 4 Distribution made on such Subsequent Distribution Date, or (ii) the remaining unpaid amount of such Holder's Allowed Class 4 Claim. Notwithstanding the foregoing, the Holder of an Allowed General Unsecured Claim may receive such other less favorable treatment as may be agreed to by such Holder and the Debtor. The NYLAJO Claim, and any Allowed Claim based on a deficiency Claim by a Holder of a Statutory Lien shall become and shall be treated for all purposes under this Plan as an Allowed General Unsecured Claim and shall be classified as a Class 4 Claim.

**4.05    Interests (Class 5)**.  Class 5 is impaired by this Plan.  Holders of Allowed Interests in Class 5 will receive nothing on account of such Interests, and the Interests shall be extinguished as of the Effective Date.  The Holders of Class 5 Interests shall be deemed to have rejected the Plan and Holders of Class 5 Interests are not entitled to vote on the Plan.

**4.06    Special Provision Regarding Unimpaired Claims**.  Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the Debtor's or the Estate's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses, setoffs or recoupment against Unimpaired Claims.

### ARTICLE V.    MEANS FOR IMPLEMENTATION OF THE PLAN

**5.01    Acquisition of New Membership Interests by Plan Funders**.  On the Effective Date, the Plan Funders shall acquire the New Membership Interests by paying the Proceeds to the Debtor.  The acquisition of the New Membership Interests shall be accomplished effective as of the Effective Date through the deemed cancellation of all certificates or other instruments representing the existing Membership Interests and the deemed issuance of all of the New Membership Interests to the Plan Funders or their nominee(s) as designated by the Plan Funders on or before the Effective Date.  The New Membership Interests shall be acquired by the Plan Funders (or their nominee) free and clear of all liens, claims and encumbrances. The Proceeds, together with the Rent Arrearage and any Cash held by the Debtor as of the Effective Date, shall be used to fund this Plan.

**5.02    Resolution of Rent Action.**  The Debtor expects that it will be awarded judgment for the Rent Arrearage in the Rent Action, and that the Rent Arrearage will be paid to the Debtor by Mercury and utilized by the Debtor to make the payments contemplated by this Plan.  The entry of a Final Order awarding judgment to the Debtor for no less than the Rent Arrearage Amount,

and the receipt of payment of a sum not less than the Rent Arrearage Amount, are conditions to the effectiveness of the Plan.

**5.03   Management of the Debtor and the Estate After Confirmation.**

    **(a)   Reorganized Company.** On and after the Effective Date, the management and operation of the Reorganized Company shall become the responsibility of the Plan Funders or their nominees. Effective as of the Effective Date, (i) all existing directors, officers, managers and employees of the Debtor shall be deemed to have resigned, and (ii) Ronald L. Rosenfield shall be deemed appointed to serve as the manager of the Reorganized Company, whereupon he shall have the right and power in accordance with the Reorganized Company's organizational documents to appoint and/or hire such officers and employees of the Company as he deem[s] appropriate in his/her/their sole discretion.

    **(b)   Debtor's Estate.** On the Effective Date, all property of the Estate, including without limitation the Premises, shall revest in the Reorganized Company, free and clear of all liens, claims and encumbrances, except as otherwise provided in this Plan with respect to the Holders of the Allowed Claims in Classes 1, 2 and 3.

**5.04   Sources of Cash for Plan Distribution.** Except as otherwise provided in the Plan or the Confirmation Order, all funds necessary for the Debtor to make payments pursuant to the Plan shall be obtained from the Debtor's estate including the Proceeds received from the Plan Funder on the Effective Date, the Rent Arrearage and any Cash of the Debtor or the Estate as of the Effective Date. Cash payments to be made pursuant to the Plan shall be made by the Debtor.

**5.05   Corporate Action.** On the Effective Date, the issuance of the New Membership Interests and any securities evidencing the New Membership Interests of the Reorganized Company, and any and all other corporate actions taken by the Reorganized Company incident to the Plan shall be deemed authorized and approved by virtue of entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable State law and without any requirement of further action by the members or managers of the Debtor or of the Reorganized Company.

**5.06   Authority to Object to Claims and Interests.** Prior to the Effective Date, the Debtor, and from and after the Effective Date but no later than the Claim Objection Deadline, the Reorganized Company shall be authorized to object to any Claims or Interests filed against the Debtor's Estate.

**5.07   Implementation of Bankruptcy Code Section 1146(c).** Any transfers or other transactions that occur pursuant to or in connection with this Plan or the Confirmation Order contemplated to be effected on or soon after the Effective Date, may not be taxed under any federal, State, or local law imposing a stamp tax, real estate transfer tax, recording tax, or similar tax.

## ARTICLE VI.   ACCEPTANCE OR REJECTION OF THE PLAN

**6.01   Classes Entitled to Vote.** Each Holder of an Allowed Claim in Classes 1 and 4 shall be entitled to vote to accept or reject the Plan as provided for in the order entered by the Bankruptcy

Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

## 6.02    Classes Not Entitled to Vote

*Presumed Acceptance of Plan.* Classes 2 and 3 are unpaired and are conclusively presumed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

*Presumed Rejection of Plan.* Class 5 is receiving nothing under the Plan, and is conclusively presumed to reject the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

## ARTICLE VII.    PROVISIONS GOVERNING DISTRIBUTIONS

**7.01    Distributions for Claims Allowed as of the Effective Date.** Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable, and any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or within 30 days of the Effective Date. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to this Article VII.

**7.02    Interest on Claims.** Except as otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law or ordered by the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

**7.03    Distributions by the Debtor.** The Debtor shall make all distributions of Cash required to be distributed under the applicable provisions of the Plan. The Debtor may employ or contract with other entities to assist in or make the distributions required by the Plan.

**7.04    Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

    **(a)    Delivery of Distributions in General.** Distributions to Holders of Allowed Claims or Interests shall be made at the addresses set forth in the Schedules or, if a proof of claim was filed, in the proof of claim, unless prior to the time of the distribution, the Debtor has received in writing a notification of change of address.

    **(b)    Undeliverable and Unclaimed Distributions.**

        (i)    <u>Holding and Investment of Undeliverable and Unclaimed Distributions.</u> If the distribution to any Holder of an Allowed Claim or Interest is returned to the Debtor as undeliverable or is otherwise unclaimed, or if the Holder of a Claim or Interest has not provided the Debtor with a taxpayer identification number in response to a request made by the Debtor, no further distributions

shall be made to such Holder unless and until the Debtor is notified in writing of such Holder's then-current address and/or taxpayer identification number, as the case may be. Undeliverable and unclaimed distributions (unclaimed distributions shall include a Person's failure to provide a taxpayer identification number in response to a request made by the Debtor) shall be designated on the books and records as an "unclaimed distribution reserve" (the "Unclaimed Distribution Reserve"), for the benefit of all such similarly situated Persons until such time as a distribution becomes deliverable, is claimed or a taxpayer identification number is provided, or is forfeited under this Section 7.04 of the Plan.

(ii)     After Distributions Become Deliverable. The Debtor shall make all distributions that have become deliverable or have been claimed (or for which a taxpayer identification number has been provided) since the Effective Date.

(iii)    Failure to Claim Undeliverable Distributions. Any Holder of a Claim or Interest that does not assert a claim or interest in any undeliverable or unclaimed distribution within 90 days after the date of the issuance of the check for the first distribution that was returned as undeliverable or unclaimed, or the date of the Debtor's first written request for a taxpayer identification number (whether or not also returned as undeliverable) shall be deemed to have forfeited its claim to or interest in such undeliverable or unclaimed distribution(s) (and all interest thereon), and shall be forever barred and enjoined from asserting any claim to or interest in an undeliverable or unclaimed distribution(s) (and all interest thereon), and such Holder of an undeliverable or unclaimed distribution shall thereafter be deemed to have waived any and all of its Claims or Interest and any right to a distribution thereon. In such cases, any Cash in the Unclaimed Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Debtor free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require the Debtor to attempt to locate any Holder of a Claim or Interest.

**7.05   Record Date for Distributions.** The Debtor will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Interest that occurs after the close of business on the Confirmation Date and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Confirmation Date. The Debtor shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official claims register maintained by the Court in the Chapter 11 Case (or otherwise listed in the Schedules) as of the close of business on the Confirmation Date.

**7.06    Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the claim, to the portion of such Claim representing accrued but unpaid interest.

**7.07    Means of Cash Payment**.  Except as otherwise provided in the Plan, payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Debtor, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Debtor.

**7.08    Withholding and Reporting Requirements**.  In connection with the Plan and all distributions thereunder, the Debtor shall comply with all withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**7.09    Time Bar to Cash Payment**.  All uncashed distributions shall be handled in accordance with this Section 7.09 unless provided otherwise by applicable law.  Checks issued by the Debtor in respect of Allowed Claims or Interests shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof and thereafter shall be treated under the Plan as an unclaimed distribution subject to Section 7.04 of the Plan.  The Holder of the Allowed Claim or Interest to whom such check originally was issued shall make requests for re-issuance of any check to the Debtor.  Any claim in respect of such a voided check shall be made on or before forty five (45) days after the expiration of the ninety (90) day period following the date of issuance of such check.  After such date, all funds held on account of such voided check shall become the property of the Debtor free and clear of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  The Holder of any such Claim or Interest shall not be entitled to any other or further distribution under the Plan on account of such Claim or Interest and shall be deemed to have waived its Claim or Interest and any right to a distribution thereon.

**7.10    Setoffs**.  The Debtor may, pursuant to Section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or its Estate may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Estate of any such Claim that the Estate may have against such Holder.

**7.11    Fractional Dollars; De Minimis Distributions**.  Notwithstanding any other provision of the Plan (a) the Debtor shall not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made may be rounded to the nearest whole dollar (up or down), with amounts less than 50 cents being rounded down, and (b) the Debtor shall have no obligation to make a distribution on account of an Allowed Claim or Interest to a specific Holder of an Allowed Claim or Interest if the amount to be distributed to that Holder on the particular

- 15 -

Distribution Date or Subsequent Distribution Date would be $10.00 or less in the aggregate, unless a request therefore is made in writing to the Debtor. Any unclaimed distributions pursuant to this Section 7.11 will become property of the Debtor free and clear of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

## ARTICLE VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.01   Assumption or Assumption and Assignment.**

(a)   **Assumption And Assignment Generally.** Effective upon the Effective Date, the Reorganized Company shall be deemed to have assumed (i) the Mercury Lease, and (ii) the executory contracts and unexpired leases that are listed in Schedule C to the Plan. The Plan Funders reserve the right to amend the list of contracts and leases to be assumed through the conclusion of the Confirmation Hearing or such later date established by the Court.

(b)   **Cure Payments.** Schedule C to the Plan specifies the Cure Payment, if any, that the Debtor acknowledges must be tendered in order to provide cure and compensation in accordance with Section 365(b)(1)(A) and (B) of the Bankruptcy Code. In the event that any party to a contract or lease listed on Schedule A contends that the Cure Payment amount is incorrect, such party must file with the Bankruptcy Court and serve upon counsel for the Debtor a written statement and an accompanying affidavit in support thereof specifying the amounts allegedly owing under Section 365(b)(1)(A) and (B) of the Bankruptcy Code no later than the deadline established by the Bankruptcy Court in its order scheduling the Confirmation Hearing. Failure to timely file and serve such statement shall result in the determination that the Debtor's tender of the Cure Payment as specified in Schedule C shall provide cure and compensation for any and all defaults and unpaid obligations under such contract or lease, and that no other amounts are owing thereunder as of the Confirmation Date. All Cure Payments that may be required by Section 365(b)(1) of the Bankruptcy Code shall be made by the Debtor on the later of (i) thirty (30) days after the Effective Date, or as soon thereafter as is practicable, (ii) thirty (30) days after resolution by a Final Order of any dispute with respect to such Cure Payment, and (iii) such time as may otherwise be agreed by the parties to any particular contracts or leases.

**8.02   Rejection.**

(a)   **Rejection Generally.** Effective upon the Effective Date, the Debtor hereby rejects all executory contracts and unexpired leases that exist between the Debtor and any other entity that are not expressly assumed by the Reorganized Company pursuant to Section 8.01 of the Plan.

(b)   **Damage Claims.** All Allowed General Unsecured Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Claims in Class 4 under the Plan. All Claims arising from the rejection of executory contracts or unexpired leases under the Plan shall constitute claims against the Estate and must be filed with the Bankruptcy Court within thirty (30) days after notice of the entry of the Confirmation Order. The Debtor or the Plan Funder shall have sixty (60) days after notice of the entry of the Confirmation Order to object to any proof of claim filed pursuant to this Section 8.02(b). Any such Claims that are not filed within such time will be forever barred from

assertion against the Debtor and the Estate, and shall not share in any distributions under this Plan.

## ARTICLE IX.   EFFECTIVENESS OF THE PLAN

**9.01   Conditions Precedent**. The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived in writing by the Plan Funders:

> (i)      the Confirmation Order shall have been entered on the docket of the Bankruptcy Court in the Chapter 11 Case for at least ten (10) days (as calculated in accordance with Bankruptcy Rule 9006(a));

> (ii)     the Confirmation Order shall have been entered and no stay of the Confirmation Order shall be in effect;

> (iii)    a Final Order determining that the amount of the Rent Arrearage is not less than $512,124.35, and awarding judgment to the Debtor for an amount which is not less than $512,124.35, without setoff, reduction or counterclaim shall have been entered in the Rent Action; and

> (iv)     the Debtor shall have received indefeasible payment of the Rent Arrearage, in Cash, in an amount not less than $512,124.35.

**9.02   Notice Of Effective Date**. As soon as practicable after the Effective Date has occurred, the Debtor shall file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

## ARTICLE X.   RELEASE AND DISCHARGE AND RELATED INJUNCTION

**10.01   Discharge**. Except as otherwise expressly provided in the Plan or the Confirmation Order, entry of the Confirmation Order shall, subject only to occurrence of the Effective Date, constitute the complete discharge and release as against the Reorganized Company of any liability, debt, or obligation of, or claim or cause of action against, or Interest in, the Debtor or the Estate that arose before the Effective Date, including, without limitation, any Claims against the Debtor of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, any Claims against the Debtor of any other nature, including, without limitation, any interest accrued thereon from and after the Petition Date, and any equity interest in the Debtor, whether or not (i) a proof of Claim or Interest based on such liability, debt, obligation, claim, cause of action or Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Interest is an Allowed Claim or Interest, or (iii) the Holder of such Claim or Interest has accepted the Plan.

**10.02   Estate's Releases**. The Debtor, for itself and as representative of the Estate, hereby waives, releases and discharges all Released Parties from any claim (as such term "claim" is defined in Section 101(5) of the Bankruptcy Code) arising from the Petition Date through the Effective Date that constitutes property of the Estate, related to such party's acts or omissions to act as an, employee, agent, representative, attorney, accountant, financial advisor or other professional of the Debtor or the Plan Funders or affiliate thereof, in that capacity.  The waiver,

release and discharge effected hereby shall, as to the Released Parties other than the Plan
Funders and related entities, not be applicable to any claim which arose prior to the Petition
Date. The release of all such claims in favor of the Released Parties shall bind all Creditors,
Holders of Membership Interests, or other parties in interest in the Chapter 11 case. Any such
release shall additionally act as an injunction against any claimant or Interest Holder of the
Debtor from commencing or continuing any action, employment of process or act to collect,
offset or recover any claim that is so released.

**10.03   Injunction.**  All Persons who have held, hold or may hold Claims against or Interests in
the Debtor shall, with respect to any such Claims or Interests, be permanently enjoined from and
after the Effective Date from taking any of the following actions (other than actions to enforce
any rights or obligations under the Plan) on account of or with respect to such Claims or
Interests: (i) commencing, conducting or continuing in any manner, directly or indirectly, any
suit, action or other proceeding of any kind (including, without limitation, any proceeding in a
judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Estate or the
Reorganized Company or any of their respective property; (ii) enforcing, levying, attaching
(including, without limitation, any pre-judgment attachment), collecting or otherwise recovering
by any manner or means, whether directly or indirectly, any judgment, award, decree or order
against the Debtor, the Estate or the Reorganized Company or any of their respective property;
(iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any
encumbrance of any kind against the Debtor, the Estate or the Reorganized Company or any of
their respective property; (iv) asserting any right of setoff, directly or indirectly, against any
obligation due the Debtor, the Estate or the Reorganized Company or any of their respective
property, except as contemplated or allowed by the Plan; (v) acting or proceeding in any manner,
in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and
(vi) prosecuting or otherwise asserting any right, claim or cause of action released pursuant to the
Plan.

**10.04   Indemnification.**  Notwithstanding anything to the contrary in this Plan, the obligations
to indemnify the Persons who served during this Case as the Debtor's respective officers,
directors and employees existing under applicable nonbankruptcy law (whether arising under
contract, bylaw or certificate of incorporation) with respect to all present and future actions,
suits, and proceedings against any of such indemnified Persons, based upon any act or omission
related to service with, for, or on behalf of the Debtor at any time during the period from the
Petition Date through the Effective Date (including acting as employee benefit plan fiduciaries or
employee benefit administrative trustees), in all cases net of applicable insurance proceeds, other
than for acts constituting willful misconduct, gross negligence, shall continue after the Effective
Date; provided, however, that the Debtor shall not be required to reserve for any such obligations
and such obligations shall be terminated and discharged upon the closing of this Chapter 11
Case. Moreover, nothing contained herein shall elevate the priority of any indemnification claim
from a General Unsecured Claim to an Administrative Claim.

**10.05   Exculpation.**  The Released Parties and any professionals retained by such parties, will
not have or incur any liability to any Person for any act taken or omission occurring on or after
the Petition Date in connection with or related to the Debtor, including but not limited to (i) the
commencement and administration of the Chapter 11 Case, (ii) the operation of the Debtor
during the pendency of the Chapter 11 Case, (iii) formulating, preparing, disseminating,

implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (iv) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (v) any Distributions made pursuant to the Plan, except for acts constituting willful misconduct or gross negligence, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. The entry of the Confirmation Order shall constitute the determination by the Court that the Debtor and its present officers, directors, professionals, employees, managers (except Martin), members (except Martin), trustees, agents, attorneys, financial advisors, partners and accountants shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to, among others, Sections 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing.

## ARTICLE XI.   PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

**11.01   No Distributions Pending Allowance**. Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

**11.02   Prosecution of Objections**. The Debtor may file objections to Claims with the Bankruptcy Court and shall serve such objections upon the Holders of each of the Claims to which objections are made. Any objection to Claims must be filed by the Claim Objection Deadline, or such extended date as may be set by the Bankruptcy Court upon the motion of the Debtor or other party in interest. Subject to the limitations set forth in the Plan, the Debtor shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction over the validity, nature and/or amount thereof, or, subject to the approval of the Bankruptcy Court except as otherwise set forth in this Plan, settling such objections.

**11.03   Estimation**. The Debtor may, at any time prior to the Effective Date, request that the Bankruptcy Court estimate any Disputed Claim for the purpose of allowance pursuant to Section 502(c) of the Bankruptcy Code regardless of whether an objection has previously been filed; the Allowed Amount of such Claim shall not exceed the amount estimated by the Bankruptcy Court.

**11.04   Disputed Claims Reserve**. On the Effective Date (or as soon thereafter as is practicable), the Debtor shall create and fund or withhold the Disputed Claims Reserve (either in a separate account or on the books and records) in an amount of the Estate's Cash equal to one hundred percent (100%) of distributions to which Holders of Disputed Claims would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in their full amount (or in such other amount as may be determined by the Bankruptcy Court in an estimation proceeding pursuant to Section 502(c) of the Bankruptcy Code). On each Subsequent Distribution Date, the Debtor shall pay to the Disputed Claims Reserve a sum of Cash equal to the distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in their full amount on such Subsequent Distribution

Date.  Cash withheld and reserved for payments to Holders of Disputed Claims may be held and deposited by the Debtor in one or more segregated interest-bearing reserve accounts or in a commingled account, as determined by the Debtor, to be used to satisfy such Claims if and when such Disputed Claims become Allowed Claims.

**11.05  Investment of Disputed Claims Reserve**.  The Debtor shall be permitted, from time to time, to invest all or a portion of the Cash in the Disputed Claims Reserve in United States Treasury Bills, interest-bearing certificates of deposit, money market accounts, overnight investments or investments permitted by Section 345 of the Bankruptcy Code or otherwise authorized by the Bankruptcy Court, using prudent efforts to enhance the rates of interest earned on such Cash without inordinate credit risk or interest rate risk.  All interest earned on such Cash shall be held in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of such Disputed Claims Reserve, including taxes payable on such interest income, if any, shall be transferred out of such Disputed Claims Reserve and, in the discretion of the Debtor be used to satisfy the costs of administering and fully consummating the Plan or become Cash for distribution in accordance with the Plan or the Debtor's operational requirements.

**11.06  Allowance of Disputed Claims**.  If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Debtor shall distribute from the Disputed Claims Reserve to the Holder of such Allowed Claim the amount of Cash that such Holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date.

**11.07  Release of Funds from Disputed Claims Reserve**.  If, at any time or from time to time after the Effective Date, there shall be Cash in the Disputed Claims Reserve in an amount in excess of the maximum remaining payment obligations to the then existing Holders of Disputed Claims against the Debtor or the Estate under the Plan, such excess funds shall become the property of the Debtor free and clear of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

## ARTICLE XII.   RETENTION OF JURISDICTION

Following the Confirmation Date, and further following the Effective Date, the Bankruptcy Court shall retain jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

        (1)     to determine any and all adversary proceedings, applications, motions, and contested matters arising in or related to the Chapter 11 Case;

        (2)     to ensure that distributions to Holders of Allowed Administrative Expenses and Allowed Claims and Allowed Interests are accomplished as provided herein;

        (3)     to hear and determine any objections to Administrative Expenses, to proofs of claims, and to proofs of Interests filed both before and after the Confirmation Date, and to allow, estimate, or disallow any Disputed Administrative Expense or Disputed Claim or Interests, in whole or in part;

(4)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(5)     to enforce the Plan and issue orders in aid of execution of the Plan and to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any entity;

(6)     to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(7)     to hear and determine all applications for compensation and reimbursement of expenses of professionals under Sections 330, 331, and 503(b) of the Bankruptcy Code, and to resolve any disputes regarding payment for professional services incurred after the Effective Date for purposes of implementing the Plan or administering the Chapter 11 Case;

(8)     to hear and determine any disputes arising in connection with the interpretation, implementation, execution, or enforcement of the Plan, the Confirmation Order, any other order of the Bankruptcy Court;

(9)     to recover all assets of the Debtor and property of the estate, wherever located;

(10)     to hear and determine any matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(11)     to resolve any controversy or claim arising out of or relating to implementation of the Plan or of the Debtor's rights and obligations under the Plan or any breach thereof;

(12)     to hear any other matter not inconsistent with the Bankruptcy Code; and

(13)     to enter a final decree closing the Chapter 11 Case.

## ARTICLE XIII.  MISCELLANEOUS PROVISIONS

**13.01   Bar Date for Administrative Claims** .  Proofs of claim or applications for payment of Administrative Claims arising before the Effective Date must be filed with the Court, with a copy to the Debtor on or before the Claims Objection Deadline.  Any Person that fails to file such a proof of claim or application with the Court within that time shall be forever barred from asserting such an Administrative Claim against any of the Debtor, the Estate, or their property, or commencing or continuing any action, employment of process, or act to collect, offset, or recover any such Administrative Claim.

**13.02  Preservation Of Rights And Defenses.**  Except to the extent such rights, claims, causes of action, defenses, and counterclaims are expressly and specifically released in connection with the Plan or in any settlement agreement approved during the Chapter 11 Case, (i) any and all rights, claims, causes of action, defenses, and counterclaims accruing to the Debtor or its estate (including, without limitation, Avoidance Power Causes Of Action and the Project Claims) shall vest in the Reorganized Company, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, causes of action, defenses, and counterclaims have been Scheduled or otherwise listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, and (ii) the Debtor does not waive, relinquish, or abandon (nor shall the Debtor be estopped or otherwise precluded from asserting) any right, claim, cause of action, defense, or counterclaim that constitutes property of the Debtor's estate, (a) whether or not such right, claim, cause of action, defense or counterclaim has been listed or referred to in the Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such right, claim, cause of action, defense, or counterclaim is currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such right, claim, cause of action, defense, or counterclaim filed a proof of claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against this Plan, or received or retained any consideration under this Plan.  Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, claim, cause of action, defense, or counterclaim, or potential right, claim, cause of action, defense, or counterclaim in the Debtor's Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, shall in no manner waive, eliminate, modify, release, or alter the Debtor's right to commence, prosecute, defend against, settle, and realize upon any rights, claims, causes of action, defenses, or counterclaims that the Debtor has or may have as of the Confirmation Date. The Debtor shall constitute the representative of the Estate with respect to all claims and interests described in this Section 13.02, and may commence, prosecute, defend against, recover on account of, and settle all rights, claims, causes of action, defenses, and counterclaims in its sole discretion.

**13.03  Saturday, Sunday Or Legal Holiday.**  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

**13.04  Headings.**  Headings are used in this Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

**13.05  Binding Effect.**  The Plan shall be binding upon and inure to the benefit of the Debtor, Reorganized Company, Holders of Claims, Holders of Interests, and their respective successors, assigns, heirs, and beneficiaries.

**13.06  Modification Of The Plan.**  The Debtor may alter, amend, or modify the Plan pursuant to Section 1127 of the Bankruptcy Code.

**13.07  Other Documents And Actions.**  The Debtor and the Reorganized Company may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under this Plan.

**13.08  Governing Law.**  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the Commonwealth of Massachusetts (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**13.09  Notices.**  Any notice to the Debtor required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows (as applicable):

| | | |
|---|---|---|
| Debtor | Michael J. Goldberg, Esq.<br>Casner & Edwards, LLP<br>303 Congress Street<br>Boston, MA  02210 | |
| | Brewery Properties Group, LLC<br>18 Sheffield Road<br>Boxford, MA  01921 | |
| United States Trustee for the District of Massachusetts | Office of the United States Trustee<br>Department of Justice<br>McCormack Post Office and Courthouse<br>5 Post Office Square<br>Boston, MA 02109<br>Attn:  John P. Fitzgerald, Esq. | |

**13.10  No Admissions**. Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Estate with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of a Claim's classification.

BREWERY PROPERTIES GROUP, LLC

By its proposed attorneys,

Dated: May 6, 2011

/s/ Michael J. Goldberg
Michael J. Goldberg (BBO# 551869)
A. Davis Whitesell (BBO #551462)
Andrew Imbriglio (BBO #676049)
CASNER & EDWARDS, LLP
303 Congress Street
Boston, MA  02210
Tel.: (617) 426-5900
Fax: (617) 426-8810
Email: goldberg@casneredwards.com

**SCHEDULE A**

**Project Claims[1]**

| POTENTIAL DEFENDANT | DESCRIPTION OF CLAIM |
|---|---|
| Danversbank | Negligent administration of loan; improper approval of loan requisitions; lender liability |
| Mercury Brewing & Distribution Co., Inc. | Improper management of construction project; approval of change orders without authorization; conversion; rent arrearages (see Item 16, above); fraud; violations of M.G.L. c.93A |
| Thomas Hagan | Breaches of construction contract |
| Pitman & Wardley Architects | Breaches of architect contract; negligent supervision of construction project |
| Robert Martin | Breaches of fiduciary duty in capacity as Manager of Debtor; negligent supervision of construction project; fraud; violations of M.G.L. c.93A |
| Timothy Sheehan | Aiding and abetting breaches of fiduciary duty; violations of M.G.L. c.93A |
| Soffron Holdings, LLC | Aiding and abetting breaches of fiduciary duty; violations of M.G.L. c.93A |

---

[1] Schedule A is provided for information purposes only, and is not in any way intended to limit the Persons against whom the Debtor may have claims, the nature and extent of the claims the Debtor may hold against any Person, or the bases upon which those claims may be asserted, and all of the Debtor's rights and remedies with respect to Project Claims are reserved.

# EXHIBIT B

## Legal Description of Premises

### Parcel I -- 2 Soffron Lane, Ipswich, Massachusetts

The land on Soffron Lane (formerly Brown Square and Brown Square Extension), Ipswich, Essex County, Massachusetts, with the buildings thereon being shown on a plan entitled "Plan of Land in Ipswich, MA, Property of Soffron's Incorporated", Scale 1" = 20', dated Nov. 24, 1986, drawn by Donohoe and Parkhurst, Inc. recorded with the Essex South District Registry of Deeds in Plan Book 220 as Plan No. 85 (the "Plan"), to which Plan reference is made for a more particular description of the premises.

Excluding from the above-described premises the land in Ipswich, Essex County, Massachusetts, at Brown's Square and being shown as Parcel B and Parcel D on a plan entitled "Plan of Land in Ipswich, MA, property of Soffron's, Incorporated and Tedford & Martin, Inc.", Scale 1" = 20' dated Oct. 27, 2008, drawn by Donohoe and Parkhurst, Inc. and recorded with the Essex South District Registry of Deeds in Plan Book _____, Plan _____.

### Parcel II -- A portion of Mineral Street, Ipswich, Massachusetts

A vacant parcel of land without street frontage previously a part of land at 23 Mineral Street, Town of Ipswich, Essex County, Massachusetts and bounded and described as follows:

Beginning at a stone bound at the southeasterly corner of the parcel; thence,

| | |
|---|---|
| S 54° 20' 59" W | by land now or formerly of Soffron's, Incorporated, a distance of one hundred eighty-eight and 10/100 (188.10) feet to a stone bound; thence, |
| N 13° 51' 20" W | by land now or formerly of 7-9 Mineral Street Condominium, DSM Property Management, Inc. and then Lemieux and then O'Brien, a distance of one hundred thirty-seven and 31/100 (137.31) feet; thence, |
| N 35° 50' 30" W | by land now or formerly of Lemieux and then O'Brien, a distance of thirty-four and 92/100 (34.92) feet to a point; thence, |
| N 58° 00' 22" E | by land now or formerly of NYLAJO, LLC, a distance of one hundred nineteen and 88/100 (119.88) feet; thence, |
| S 42° 08' 16" E | by land now or formerly of NYLAJO, LLC, a distance of one hundred fifty-five and 77/100 (155.77) feet to the point of beginning. |

The above described parcel is more particularly shown as Parcel A on a plan entitled, "Plan of Land in Ipswich, MA property of NYLAJO, LLC, scale 1"=20', Oct. 9, 2008", prepared by Donohoe and Parkhurst, Inc. and recorded at Plan Book 417, Plan 22.

### Parcel III -- Parcel C, Brown Square, Ipswich, Massachusetts

The land in Ipswich, Essex County, Massachusetts, at Brown's Square and being shown as Parcel C on a plan entitled "Plan of Land in Ipswich, MA, property of Soffron's, Incorporated and Tedford & Martin, Inc.", Scale 1" = 20' dated Oct. 27, 2008, drawn by Donohoe and Parkhurst, Inc. and recorded with the Essex South District Registry of Deeds in Plan Book _____.

Parcels I, II and III are collectively shown on a plan entitled "Plan of Land in Ipswich, MA, Prepared for The Brewery Properties Group, Inc." Scale 1" = 20', dated Oct. 28, 2008, drawn by Donohoe and Parkhurst, Inc., which plan is recorded in Plan Book _____, Plan _____.

## EXHIBIT C

## Schedule of Executory Contracts and Leases to be Assumed and Cure Payments

[To be inserted]

56886.10/507443.1

## EXHIBIT B

## Projections

## 2011 and 1st Quarter 2012

| | September | October | November | December | January | February | March | Totals |
|---|---|---|---|---|---|---|---|---|
| **Income/Capital** | | | | | | | | |
| Rent | $570,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $19,000 | $684,000 |
| Capital Contributions | $150,000 | | | | | | | $150,000 |
| R/E Tax Reimbursement from Tenant | $21,000 | | | | | | | $21,000 |
| Release of Disputed Claims Reserve | | | | | $26,000 | | | $26,000 |
| **Total Income/Cash** | $741,000 | $19,000 | $19,000 | $19,000 | $45,000 | $19,000 | $19,000 | $881,000 |
| | | | | | | | | $0 |
| | | | | | | | | $0 |
| | | | | | | | | $0 |
| **Expenses** | | | | | | | | |
| Mortgage Expense | $169,871 | $13,067 | $13,067 | $13,067 | $13,067 | $13,067 | $13,067 | $248,273 |
| Payment to Creditors | $46,000 | | | | | | | $46,000 |
| Construction Expenses | $125,000 | $125,000 | $125,000 | $97,500 | $52,500 | | | $525,000 |
| Ongoing Payments To Creditors | | | | | | | $15,000 | $15,000 |
| Property Taxes Due | $21,000 | | | | | | | $21,000 |
| | | | | | | | | $0 |
| **Total Expenses** | $361,871 | $138,067 | $138,067 | $110,567 | $65,567 | $13,067 | $28,067 | $855,273 |
| | | | | | | | | |
| ***Net Cashflow for Period*** | $379,129 | ($119,067) | ($119,067) | ($91,567) | ($20,567) | $5,933 | ($9,067) | $25,727 |
| ***Cumulative Cash Flow*** | $379,129 | $260,062 | $140,995 | $49,428 | $28,861 | $34,794 | $25,727 | n/a |

## 2012-2013

| Income/Capital | 2nd Quarter | 3rd Quarter | 4th Quarter | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | |
|---|---|---|---|---|---|---|---|---|
| Rental Income | $57,000 | $57,000 | $57,000 | $57,000 | $57,000 | $57,000 | $57,000 | $399,000 |
| **Total Income** | $57,000 | $57,000 | $57,000 | $57,000 | $57,000 | $57,000 | $57,000 | $399,000 |
| **Expenses** | | | | | | | | |
| Mortgage Expense | $39,201 | $39,201 | $39,201 | $39,201 | $39,201 | $39,201 | $39,201 | $274,407 |
| Ongoing Payments To Creditors | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $105,000 |
| **Total Expenses** | $54,201 | $54,201 | $54,201 | $54,201 | $54,201 | $54,201 | $54,201 | $379,407 |
| *Net Cashflow for Period* | $2,799 | $2,799 | $2,799 | $2,799 | $2,799 | $2,799 | $2,799 | $19,593 |
| **Cumulative Cash Flow** | $28,526 | $31,325 | $34,124 | $36,923 | $39,722 | $42,521 | $45,320 | n/a |

## Notes to Projections

1.      These projections assume an Effective Date on or about September 1, 2011.

2.      Rent Arrearage payable to the Debtor on the Effective Date is $570,000.  This amount includes (i) $494,000 in accrued and unpaid rent as of the Petition Date, and (ii) four months' accrued rent between the Petition Date and the Effective Date.  Mercury's obligation to reimburse the Debtor for real estate taxes is treated separately.

3.      Real estate taxes: the amount due to the Town of Ipswich is projected to increase to $21,000 as of the Effective Date, resulting from postpetition tax accruals and interest.  Pursuant to the terms of the Debtor's Lease with Mercury, that amount will be reimbursed by Mercury as part of the Rent Arrearage.  The projections do not provide for real estate tax payments or reimbursements in future periods, as it is assumed they will be made directly by Mercury to the Town of Ipswich.

4.      Payments to creditors.  The 10% Effective Date payment provided for in the Plan is projected to be made (either to Holders of Allowed Class 4 Claims, or to the Disputed Claims Reserve) on the Effective Date.  The Debtor believes that the aggregate amount of Allowed Class 4 Claims will ultimately be approximately $200,000; thus, the projections provide for a release of $26,000 from the Disputed Claims Reserve to the Reorganized Company on or about December 31, 2011.

5.      Construction expenses are based on information provided by D&H Construction, Inc., which has confirmed a construction period of approximately 4 months.

6.      Ongoing payments to creditors: the Class 4 Distribution of $15,000 per calendar quarter will commence on March 31, 2012.

56686.12/507483.1