**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

```
----------------------------------------------------------- x
                                                            :
In re:                                                      :
                                                            :      Chapter 11
BREWERY PROPERTIES GROUP, LLC,                              :
                                                            :      Case No. 11-14208 (JNF)
                Debtor.                                      :
                                                            :
                                                            :
                                                            :
----------------------------------------------------------- x
```

**OBJECTION OF SOFFRON HOLDINGS LLC TO THE**
**DEBTOR'S DISCLOSURE STATEMENT**

Soffron Holdings LLC ("Soffron"), a secured creditor and party-in-interest in the above-caption Chapter 11 case of Brewery Properties Group, LLC (the "Debtor" or "BPG"), the debtor and debtor-in-possession herein, by and through its undersigned counsel, hereby states that the Debtor has advised it that the Debtor intends to withdraw the *Disclosure Statement Regarding Debtor's Chapter 11 Plan* that it filed on May 6, 2011 (the "Disclosure Statement") and substitute a new disclosure statement. Because objections are due today and the Disclosure Statement has not been withdrawn, Soffron is submitting this objection (the "Objection") to the Disclosure Statement. Soffron reserves all rights in the event that Debtor withdraws the Disclosure Statement, including the right to file a Response and/or Objection to any new disclosure statement, in accordance with the Bankruptcy Rules.

In support of this Objection, Soffron respectfully states the following:

## I.   PRELIMINARY STATEMENT

1.      The Disclosure Statement is inadequate and misleading.  As demonstrated below, the *Debtor's Chapter 11 Plan* (the "Plan") is unfeasible, patently unfair to creditors and otherwise unconfirmable.

2.      The Plan is unconfirmable for several independent reasons.  First, under the Plan, certain favored pre-petition owners of BPG would become the owners of the reorganized debtor which would hold title to 2 Soffron Lane, Ipswich, Massachusetts (the "Property"), in return for contributing **up to** $150,000.00 in new money.  (Apparently the pre-petition owners have not even contributed $150,000.00 in new value).  In contravention of relevant case law, the Plan does not provide creditors the opportunity to purchase the new equity, but instead provides that opportunity exclusively to the favored pre-petition owners.   Second, the Plan improperly classifies Soffron as unimpaired.  The Debtor proposes to cure the default by making a payment of $169,871 to Soffron on the Effective Date (which the schedule to the Disclosure Statement assumed would be September 1, 2011, but now will not occur until December 1, 2011 at the earliest).[1]  Excluding additional fees and costs incurred between August 2011 and the Effective Date, the actual arrearage on the Effective Date will exceed $470,000 – exceeding what Debtor proposes to pay Soffron by more than $270,000.   Accordingly, Soffron will not be paid all arrearage amounts due and is therefore impaired.  Third, the Plan calls for confirmation by creditors before the conclusion of a litigation which Debtor concedes must be resolved in its

---

[1] Debtor claims the arrearage is now $91,419 (Disclosure Statement, p. 8), and that the arrearage as of the Effective Date will be $169,871.

2

favor in order for the Plan to be feasible.[2]

3.      Debtor indicates that it will raise between $662,000 and $741,000[3] and use these funds to cover all outstanding payment defaults, complete construction of the building, pay a 10% upfront dividend to the holders of unsecured claims and pay the Town of Ipswich tax lien. Debtor further claims that it will cost $761,871.00 to fulfill the Plan conditions ($525,000 to complete construction of the Building, $169,871 to cure the default on the bonds, $21,000 to pay the Town of Ipswich tax lien and $46,000 to make a 10% upfront payment to unsecured trade creditors). The Plan is unfeasible because the Debtor has grossly underestimated the costs of satisfying the preconditions of the Plan, and its ability to raise the limited funds it contends it will raise is unacceptably speculative.

4.      First, Debtor's plan to raise between $662,000 and $741,000 is unacceptably speculative. The Debtor cannot raise the majority of the funds it claims it will raise unless, at a minimum, it prevails in litigation (the "Rent Action") against a tenant, Mercury Brewing and Distribution Company, Inc. ("Mercury" or "Lessee"), which was to occupy the Property pursuant to a lease agreement (the "Lease") after construction was completed. BPG claims that it is entitled to rent from Mercury despite the fact that: (i) BPG concedes the parties to the Lease contemplated that construction would be completed before lease payments began; (ii) the building is still far from complete (BPG has not obtained an occupancy certificate and there is no running water or electricity); and (iii) BPG never sued to recover the purported rent arrearage until after it was sued by the Lessee for breach of contract for failing to complete construction of

---

[2] The arrearage as of August 31, 2011 was $430,466.67 ($234,897.00 in overdue principal and interest payments; $183,824.82 in collection costs billed through August 2011; and $11,744.85 in late fees). On the Effective Date, even excluding the additional costs of collection which would be incurred between September 1, 2011 and December 1, 2011, the arrearage will exceed $470,000.

[3] The Disclosure Statement (p. 7) indicates that Debtor will raise $662,000, but Schedule D to the Disclosure Statement indicates that Debtor will raise $741,000.

3

the building, more than a year after the rent obligation allegedly commenced.

5.     Second, even assuming Debtor can raise the funds it claims it will raise, it will cost substantially more than $761,871 to complete construction of the Building, cure the mortgage arrearage, pay the tax lien and make a ten percent payment to trade creditors.  As noted above, Debtor has underestimated the arrearage as of the Effective Date by at least $200,000.  Accordingly, Debtor would need to raise at least $950,000.  Considering the additional collection costs that Soffron will incur before the Effective Date, Debtor would need to raise at least $1,100,000.00.  If, as Soffron expects, the Building will cost more than $525,000 to complete, then Debtor would need to raise more than $1,100,000.000.

6.     The Debtor's Plan to make post-confirmation principal and interest payments to Soffron is also unfeasible.  Debtor relies exclusively on the rent it hopes to collect from Mercury to make principal and interest payments until the bond maturity date, eighteen years from now, in 2030.  But the Lease expires ten years after commencement and the Debtor has not accounted for how it will make the debt payments after expiration of the Lease.  Nor has the Debtor accounted for how it will make the debt payments if the interest rate significantly increases, or in the event that Mercury fails to pay rent.

7.     As demonstrated herein, BPG's disclosures are wholly inadequate to meet the requirements of § 1125 of the Bankruptcy Code.  BPG has failed to disclose numerous facts which make its Plan implausible and not in the best interest of the creditors.

## II.     JURISDICTION

8.     The Court has jurisdiction to consider the Disclosure Statement and this Objection under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

### III.   FACTUAL BACKGROUND

A.   **BPG's Background.**

9.      On or about January 15, 2009, pursuant to a Bond Purchase Agreement and a Loan and Trust Agreement (collectively, the "Loan Agreement"), BPG borrowed $1,980,000 from Danversbank and became obligated to repay that amount to the initial purchaser of the bonds, Five Conant Street Investment Corp. (the "Initial Purchaser").

10.      Soffron currently owns all the bonds issued under the Loan Agreement.

11.      Beginning in 2008, Mercury advanced monies to BPG for the purpose of BPG constructing a brewery on the Property.  BPG separately entered into the Lease with Mercury under which BPG would lease the Property to Mercury.   As Debtor concedes, the parties contemplated that the brewery would be completed before rental payments would begin. (Disclosure Statement, p. 6.)

12.      BPG never completed construction of the brewery.  To this day, the Property does not have an occupancy certificate, and there is no running water or electricity.

13.      Pursuant to the Loan Agreement, BPG was obligated, *inter alia*, to make monthly principal and interest payments, and to pay late fees (*see* Loan and Trust Agreement, p. 37, § 1202) and attorneys' fees and other costs of collection (*see* Loan and Trust Agreement, p. 9, § 1004(b)).   Additionally, the Loan Agreement requires Debtor to complete construction of the brewery regardless of whether the loan amounts were sufficient to complete construction (*see* Loan and Trust Agreement, p. 21, § 601).

14.      BPG has defaulted under the Loan Agreement by failing to make monthly payments since February 2010, and by failing to complete construction of the brewery.  As of August 31, 2011, Soffron was owed $430,466.67 ($234,897.00 in overdue principal and interest

payments; at least $183,824.82 in collection costs billed through August 2011; and $11,744.85 in late fees). Even excluding additional costs of collection that Soffron will incur between now and the Effective Date, which Debtor assumed would be September 1, 2011 (Schedule B to Disclosure Statement), but now will be December 1, 2011 at the earliest, the arrearage as of the Effective Date will exceed $470,000. If there is an additional $200,000 in collection costs, then the arrearage will exceed $670,000.

15.     In June 2010, the Rent Action began in Essex County Superior Court when Mercury sued BPG for breach of the Lease for not completing construction of the brewery. In July 2010, BPG counterclaimed against Mercury for a purported rent arrearage.

16.     The Rent Action remained pending in Essex County Superior Court from June 2010 until May 4, 2011, when BPG removed the Rent Action to this Court. During the pendency of the Rent Action in Essex County Superior Court, BPG did not respond to document requests and interrogatories that Mercury propounded on March 4, 2011, and still has not supplied discovery responses.

17.     On March 11, 2011, Danversbank, in its role as Trustee under the Loan and Trust Agreement, and on behalf of the sole bond owner, Soffron, served demand notices on BPG, and the guarantors of the debt.

18.     On April 20, 2011, Danversbank, in its role as Trustee under the Loan and Trust Agreement, and on behalf of the sole bond owner, Soffron, initiated foreclosure proceedings against BPG by serving foreclosure notices. In anticipation of the foreclosure proceedings, and after extensive unsuccessful settlement negotiations, the Debtor served a demand notice on Soffron on February 11, 2011, in which it claimed it did not owe any sums under the Note and threatened suit against Soffron. Soffron responded to the demand letter on February 25, 2011.

**B.**    **The Debtor's Chapter 11 Filing**

19.    On May 3, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

20.    The Debtor continues to operate its business and manage its property as debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

21.    No trustee or examiner has been appointed in the Debtor's bankruptcy case.

**C.**    **The Disclosure Statement**

22.    On or about May 6, 2011, the Debtor filed the Disclosure Statement [Docket No. 11] in connection with the Plan.

**IV.**    **OBJECTION**

**A.**    **Legal Requirements of § 1125 of the Bankruptcy Code**

23.    In order to be approved, a disclosure statement must meet the requirements of § 1125 of the Bankruptcy Code, as follows:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

> 11 U.S.C. § 1125(b).

> "Adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan ....

> 11 U.S.C. § 1125(a)(1).

24.    Although the general rule is that the only issue to be determined by the

bankruptcy court at the hearing on disclosure statement is the adequacy of the information contained in the disclosure statement, in *In re O'Leary,* 183 B.R. 338 (Bankr. D. Mass. 1995), this Court held that "Courts may refuse to approve disclosure statements that describe plans that cannot be confirmed." *Id.* at 338-339 (citing *In re Bjolmes Realty Trust,* 134 Bankr. 1000, 1002 (Bankr. D. Mass. 1991); *In re Atlanta West VI,* 91 Bankr. 620, 622 (Bankr. N.D. Ga. 1988)).

**B.      Summary of The Plan in the Disclosure Statement.**

25.    The Disclosure Statement states that:

(a)    Following the Effective Date of the Plan, BPG will: (i) complete construction of the building at a cost of $525,000; (ii) pay Town of Ipswich's tax lien in the amount of $21,000.00; (iii) pay $46,000 to trade creditors; and (iv) pay the alleged arrearage as of the Petition Date in the amount of $91,469.91 plus additional amounts accruing between the Petition Date and the Effective Date of the plan, for a total mortgage payment to Soffron in the amount of $169,871. (Disclosure Statement p. 7 and Schedule B; Plan pp. 10-11). BPG does not identify the amount of overdue principal payments it owes Soffron, or the fees and expenses it owes Soffron, including the late fees due as a result nonpayment.

(b)    BPG states that it will fund this phase of its Plan by collecting at least $512,124.35 in the Rent Action and raising up to $150,000.00 in new money. (Plan, pp. 10-11). BPG does not state that it has commitments from the so-called Plan Funders in the amount of $150,000.

(c)    Between the Effective Date and the foreseeable future, BPG is to make monthly interest and principal payments due Soffron in the amount of $13,167.00, and quarterly payments to contractors in the approximate amount of $40,000.00. (Disclosure Statement, p. 5). BPG states that the funding source for this phase of its reorganization will be its receipt of

8

$19,000 per month in rent. BPG does not suggest that it can pay principal and interest until bond maturity. And it clearly cannot do so. BPG does not identify the term of the Lease in its Plan, but the Lease itself was included in BPG's pleading removing the Rent Action from Massachusetts Superior Court [Adv. Proc. No. 11-1161, Docket No. 1, pp. 23-27]. The Lease states that the rental amount is $19,000 per month for five years, and that the parties will mutually agree on an increased rental amount for the next five years; therefore, the Lease expires ten years after the commencement date or five years after the commencement date if the parties cannot reach an agreement on future rent.

## C.    **BPG's Plan is Facially Non-Confirmable.**

26.    The Plan provides that certain prepetition equity holders will become the equity owners of a reorganized company that will hold title to the Property. (*See* definition of "Plan Funder" at Plan, p. 6).

27.    First, it is settled law that a Plan is unconfirmable for violating the absolute priority rule when pre-petition equity holders would take ownership of the reorganized company in exchange for new value unless the Plan makes express provisions for competing plans and/or creditors were afforded the opportunity to bid for the equity in the newly reorganized company. *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454 (1999) ("[The Plan] is doomed, we can say without necessarily exhausting its flaws, by its provision for vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan"). *See also In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 865 (Bankr. D. Mass. 2000).

28.    The Debtor's Plan does not make a provision for competing plans and/or indicate

9

that creditors were afforded the opportunity to purchase equity in the new company.

29.     Second, a Plan is not confirmable when it misclassifies a creditor as unimpaired. *See In re 2712 Mission Partners, L.P.*, 2010 WL 431738 (Bankr. N.D. Cal. Jan. 22, 2010) (refusing to confirm Plan which mischaracterized secured lender as unimpaired where the Plan did not propose to entirely cure defaults).  The Plan improperly classifies Soffron as unimpaired because Soffron is currently owed $430,466.67 in overdue principal and interest, collection costs and late fees.  On the Effective Date, Soffron will be owed more than $470,000 plus an estimated additional $200,000 in costs of collection.   But the Debtor only proposed to pay Soffron $169,871 upon the Effective Date – woefully short of the amount that would actually be due to Soffron by the Effective Date.  Moreover, a creditor should not be denied the right to vote when the funding of the Plan is highly speculative and the creditor's interests could be severely compromised in the period between confirmation and the Effective Date, while the Debtor attempts to raise funds.  Soffron is not a risk investor and should not be treated as one.

30.     Third, Debtor has requested that the Plan be confirmed if it can raise at least $662,000.  In order to bring Soffron current on the Effective Date (if the Effective Date now is assumed to be December 1, 2011), BPG must pay Soffron $469,410.12 ($271,986 in overdue principal and interest payments; $183,824.82 in collection costs billed through August 2011; and $13,599.30 in late fees), plus additional collection costs incurred by Soffron between now and the Effective Date.  Even assuming that Debtor can complete construction of the Building for $525,000, Debtor will need to raise at least $900,000 to consummate its Plan, far more than $662,000 it proposes would be sufficient to permit confirmation of the Plan.

31.     Even assuming, *arguendo*, that Debtor could satisfy the pre-conditions of the Plan at a cost of $662,000, the Plan is unconfirmable because the funding is unacceptably speculative.

The Plan to raise new funds is premised on a litigation claim that is facially implausible. Courts refuse to confirm plans that are predicated on uncertain litigation outcomes. *See In re Yeager*, 2004 WL 422049 (Bankr. E.D. Pa. Feb. 18, 2004) ("A plan dependent on an uncertain litigation outcome cannot be confirmed because it simply is not feasible.") (citing *In re Ewald*, 298 B.R. 76, 81 (Bankr. E.D. Va. 2002); *In re Jensen*, 425 B.R. 105, 110 (Bankr. S.D.N.Y. 2010) ("Bankruptcy courts in the Southern District of New York and elsewhere have converted chapter 11 cases to cases under chapter 7 where the debtor proposed to fund a plan out of the proceeds of potential litigation") (citing *In re FRGR Managing Member LLC*, 419 B.R. 576, 581-584 (Bankr. S.D.N.Y. 2009) (collecting cases converting Chapter 11 cases to Chapter 7 cases where the debtor's primary asset was a potential lawsuit)).

32.    Also, the Disclosure Statement indicates that Debtor intends to raise <u>up to $150,000</u> in new value (Disclosure Statement, p. 7) but does not indicate that it has received $150,000 in commitments for new value or the source of those funds. A plan should not be confirmed that relies on such uncertain funding. *See In re Walker*, 165 B.R. 994, 1003-04 (E.D. Va. 1994) "[T]he debtor must offer more than speculation about the source of funding for the plan.") (citing *In re Briscoe Enterprises, Ltd.*, 138 B.R. 795, 807 (N.D.Tex.1992); *In re Stuart Motel, Inc.*, 8 B.R. 48, 50 (Bankr. S.D. Fla.1980)). *See also In re Fantasia*, 211 B.R. 420, 423 (B.A.P. 1st Cir. 1997) ("mere speculation as to the source of funds is not sufficient to satisfy feasibility" of proposed Chapter 13 plan) (citing *In re Harris*, 199 B.R. 434, 436–37 (Bankr. D.N.H.1996)).

**D.    BPG Has Failed to Provide Adequate Information in its Disclosure Statement.**

33.    The Disclosure Statement fails to provide adequate information to assist a typical investor or holder of claims to evaluate the feasibility of the Plan, either with respect to the

conditions that are to occur before or immediately after confirmation of the Plan, or the conditions that are to occur between the Effective Date of the Plan and the maturity date of the bonds held by Soffron.

34.    The Disclosure Statement fails to provide a hypothetical claim holder with sufficient information to make an informed judgment about the feasibility of the Plan.  As demonstrated below, the Disclosure Statement does not contain adequate information concerning:  (i) the amount of money BPG will need to perform the conditions precedent to Plan Confirmation, (ii) the ability to raise the funds BPG claims are needed to fulfill the conditions precedent to the Plan Confirmation, and (iii) the ability to make payments to creditors after the Effective Date of the Plan.

**1.    BPG Has Failed to Disclose Facts Pertinent to the Amount of Money
Needed to Pay the Arrears and Complete Construction of the Building.**

35.    BPG claims that it will agree to pay unpaid amounts of the Soffron Loan.  The Debtor contends that the only amount outstanding is an arrearage in interest payments in the amount of $91,469.91.  Preliminarily, the amount of past due principal and interest currently is $234,897.00, not $91,469.91.  More significantly, BPG has failed to disclose that the Loan Agreement requires BPG to pay Soffron's fees and expenses incurred in collecting on the bonds, as well as administrative fees and late fees.  Through August 2011, Soffron incurred collection costs in excess of $183,824.82.  The Debtor's own conduct in asserting meritless claims greatly increased Soffron's legal fees.

36.    Debtor's failure to disclose its obligations to pay Soffron's fees and expenses in enforcing the bonds bear directly on the feasibility of the Plan.  The Debtor only purports to collect $741,000.00 to satisfy the loan arrearage on the Effective Date, complete construction of the Building, pay the Town of Ipswich's tax lien, and make partial payment to other creditors.

12

The actual cost of fulfilling these obligations will easily exceed $1,000,000. Simply put, Debtor's Disclosure Statement fails to identify the actual costs to cure its default on the bonds and the failure to disclose all such costs has a material impact on the feasibility of the Plan.

37.     Moreover, BPG has not adequately disclosed the basis for its projection that it will only cost $525,000.00 to complete construction of the Building. On information and belief, BPG significantly underestimates the cost to complete the building, and the true completion cost is in the range of $750,000 - $1,000,000. Debtor did not submit any written estimate to complete the building in connection with the Disclosure Statement. At the Section 341 Meeting on June 7, 2011, however, BPG's manager, Ronald Rosenfield, indicated that Debtor received one quote/estimate of approximately $1,000,000.

**2.     BPG Has Failed to Disclose Facts Pertinent to Its Ability to Prevail in the Rent Action or Mercury's Ability to Pay a Judgment.**

38.     BPG has failed to provide adequate information to assist a holder of claims to evaluate whether BPG will prevail in the Rent Action, or whether BPG would be able to collect any judgment it might obtain against Mercury. Specifically, BPG has failed to disclose facts that would reveal that BPG's rent claim is facially implausible. For instance, BPG has failed to disclose that it has not obtained an occupancy certificate, or that the building's heating, HVAC, water and electricity all remain uncompleted. Nor has BPG addressed the impact of its failure to complete the building, or obtain an occupancy certificate on its ability to prevail in the Rent Action in circumstances where BPG concedes that the parties contemplated that the building would be completed before the obligation to pay rent commenced. (*See* Disclosure Statement, p. 5.)

39.     BPG has also failed to disclose that it never sued Mercury to recover any purported rent until more than one year after it now claims rent was due, and not until after

Mercury had sued BPG for breaching the Lease by failing to complete construction of the building as required. Holders of claims should be informed that the pre-litigation course of conduct is inconsistent with the claim for rent BPG asserted for the first time only after it was sued for breaching the Lease.

40. The deficiencies in BPG's position in the Rent Action have real significance to holders of claims. As BPG concedes, it cannot reorganize if it does not succeed in the Rent Action. (*See* Disclosure Statement, p. 14.)

41. If the Court does not reject the Disclosure Statement, then Soffron respectfully submits that the Court should expedite the Rent Action with trial scheduled within forty-five days. Claim holders should not have to vote on the Plan before knowing if BPG can prevail in the Rent Action. The delay in confirmation of the Plan is prejudicial to the creditors because they will not be paid during the delay and the value of the Property deteriorates further the longer it remains vacant.

42. BPG has also failed to project its attorneys' fees needed to prosecute the Rent Action, and creditors are not informed that the Mercury Lease does not have an attorney fees provision. BPG is certain to incur attorneys' fees and costs in prosecuting the claim for rent owed. This lack of disclosure also has real significance because BPG only purports to raise between $662,000.00 and $741,000. The Debtor's necessary attorney fees will simply add to the $1,000,000 plus that would actually be needed to fund the Plan.

43. Lastly, BPG has wholly failed to address Mercury's ability to pay a $525,000 judgment. Again, Mercury's ability to pay a judgment has real significance on the feasibility of the Plan. Indeed, the Debtor concedes as much by stipulating in its Plan that its ability to collect $512,524.00 on the Rent Action is a condition to the effectiveness of the Plan.

14

3.      **BPG Has Failed to Disclose Whether It Actually Has
Commitments from New Money Investors to Raise $150,000 or
Whether Outside Investors Were Given the Opportunity to Invest.**

44.     Even if the Plan was not fatally defective due to the favored treatment of certain
pre-petition equity holders, Debtor has failed to disclose whether it actually has commitments
from those so-called Plan Funders to raise $150,000.00.  Debtor's only disclosure is that "Debtor
seeks to … [r]aise additional capital of up to $150,000 from the Plan Funders in exchange for the
issuance of the New Membership Interests."  (Disclosure Statement, p. 7).

45.     Debtor's failure to raise the $150,000.00 in new money would be an independent
reason precluding Debtor from meeting its Plan obligations.

4.      **BPG Has Failed to Make Adequate Disclosures Concerning its Ability
to Make Principal and Interest Payments After Plan Confirmation.**

46.     BPG has failed to provide adequate information concerning whether $19,000 in
monthly rent would be sufficient to make interest and principal payments to Soffron for the next
20 years until bond maturity, and also pay the operating expenses BPG is required to pay under
the Lease, and other professional fees.

47.     Preliminarily, BPG does not disclose that the Lease only has a term of ten years –
and that the Lease expires, at the latest, approximately eleven years before the bond maturity
date.  BPG has not addressed how it will make interest payments, and pay other professional
fees, in the eleven-year period after the Lease expires but before the bond maturity date.  Soffron
is the largest creditor and the inability to demonstrate how it will make monthly interest and
principal payments between 2019 and 2030 renders the Plan unconfirmable and therefore
warrants disapproval of the Disclosure Statement.  BPG also does not indicate how it will pay
Soffron if Mercury refuses to pay in the first ten years and/or cannot pay the rent.  Of particular

note, the rental term is only fixed for five years.

48.    BPG also does not identify the impact of an interest rate increase in the next ten years and it does not project its costs to maintain the building and other professional fees necessary with the upkeep of BPG.  BPG's payments will increase by $9,052.70 annually for every one-half percent increase in the interest rate.  Debtor proposes to make mortgage payments in the amount of $13,067 per month.  A significant increase in the interest rate would mean that the mortgage payments would exceed the rent payment Debtor hopes to receive from Mercury.

**5.    The Disclosure Statement Fails to Disclose Potential Claims Against One of the Favored Pre-Petition Equity Holders, Todd Darling.**

49.    Although the Disclosure Statement contains a four-page list of purported transgressions by virtually any person or entity involved in the Project, absent from the list and Exhibit B is any description of the Debtor's claims against Todd Darling for mismanagement of the Project or the Debtor's pre-bankruptcy business affairs.  The Debtor has fiduciary duties to the creditors to pursue all valid claims against third parties.

**6.    The Disclosure Statement Should Not be Approved Because it Does Not Identify the Plan's Tax Consequences.**

50.    Article VIII of the Disclosure Statement, entitled "Certain Tax Consequences of the Plan" does not comply with the requirements of § 1125 in that it fails entirely to provide any analysis of the tax consequences of the Plan on the Debtor or creditors.  In 2005, section 1125(a)(1) was amended to require a disclosure statement to contain a "discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case."  Here, the disclosure statement states only "Because the tax consequences of the Plan may vary based on individual circumstances, each holder of a Claim or Interest is urged to consult with its own tax

16

advisor as to the consequences of the Plan to it under federal and applicable state, local, and foreign tax laws." The Debtor has failed to meaningfully address the tax impact of its plan. *See In re Pacific Shores Development, Inc.*, 2011 Bankr. LEXIS 785, at * 14 (Bankr. S.D. Cal. Feb. 25, 2011) (court denied approval of the debtor's disclosure statement based on its finding that the disclosure statement provided insufficient detail regarding the tax consequences of the debtor's plan); *In re Zaruba*, 2008 Bankr. LEXIS 2461, at *16 (Bankr. D. Alaska Mar. 11, 2008) (finding that the debtors failed to meaningfully address the tax impact of their plans by not offering any expert testimony as to the likely tax results of their plans).

## RESERVATION OF RIGHTS

51.     Soffron reserves the right to revise, amend and/or supplement this Objection at any time, including but not limited to at any hearing on the Disclosure Statement.

## NOTICE, PRIOR REQUEST AND WAIVER OF MEMORANDUM OF LAW

52.     Notice of this Objection has been given to:  (i) the Office of the United States Trustee for the District of Massachusetts; (ii) counsel to the Debtor; (iii) counsel to the Committee, if one has been appointed; and (iv) all parties that have filed a request for notices in this Chapter 11 case.  In light of the nature of the relief requested herein, Soffron submits that no other or further notice is required.

53.     No other or prior request for relief sought herein has been made to this or to any other court.

54.     As no novel issue of law is raised and the relevant authorities relied upon by Soffron are set forth herein, Soffron respectfully requests that the requirement of the filing of a memorandum of law be waived.

55.    The undersigned counsel hereby certifies in accordance with Local Bankruptcy Rule 3017-1 that he contacted Debtor's counsel prior to filing this objection in a good faith effort to confer and narrow areas of disagreement concerning the objections to Debtor's disclosure statement set forth herein.

WHEREFORE, Soffron respectfully requests that the Court:  (i) deny approval of the Disclosure Statement as filed; (ii) require the Debtor to provide such information as is necessary to satisfy the requirements of § 1125 of the Bankruptcy Code; and (iii) grant such other relief as the Court deems appropriate.

Dated:  October 31, 2011

Respectfully submitted,

**LeClairRyan,**
A Professional Corporation,

By:   */s/ James L. Messenger*
James L. Messenger, Esq.
James.Messenger@leclairryan.com
John W. Moran, Esq.
John.Moran@leclairryan.com
One International Place, 11th Floor
Boston, Massachusetts 02110
Telephone:  (617) 502-8200
Facsimile:  (617) 502-8201

*Counsel for Soffron Holdings LLC, A Secured Creditor and Party-In-Interest*

18

## CERTIFICATE OF SERVICE

I, John W. Moran, hereby certify that on this 31st day of October, 2011, I caused to be

served a copy of the foregoing document, upon the following parties via the Court's ECF system,

as indicated, or via first class mail:


/s/ *John W. Moran*
John W. Moran


John Fitzgerald   USTPRegion01.BO.ECF@usdoj.gov
Paula R.C. Bachtell  Paula.Bachtell@usdoj.gov
Michael J. Goldberg   Goldberg@casneredwards.com
Gregory O. Kaden  gkaden@goulstonstorrs.com
Thomas J. Flannagan  tflannagan@mhdpc.com
William H. Sheehan III  wsheehan@mhdpc.com
Douglas B. Rosner    drosner@goulstonstorrs.com
Kathleen R. Cruickshank  krc@murphyking.com; bankruptcy@murphyking.com
Joel Jay Rogge  jjrogge@comcast.net; wendymbell@comcast.net

William H. Sheehan III, Esq.
MacLean Holloway Doherty Ardiff & Morse
8 Essex Center Drive
Peabody, MA  01960

BES Electrical Contracting, Inc.
17 Longmeadow Drive
Ipswich, MA  01938

Breen & Sullivan Mechanical Services, In
7 Healy Court
Danvers, MA  01923

Bresnahan & Horrigan, Inc.
30A Mitchell Road
Ipswich, MA  01938

Brewery Food Group, LLC
c/o Robert Martin
221R Washington Street
Topsfield, MA  01983

CG&V Services, LLC

167 Hopkins Street
Reading, Ma  01867

Danvers Door Company, Inc.
2-A Debush Avenue, Unit 6
Middleton, MA  01949

Danversbank
One Conant Street
Danvers, MA  01923

Geotechnical Services, Inc.
12 Rogers Road
Haverhill, MA  01835

Ken Ledbury d/b/a Green's point Masonry
3 Greens Point Road
Ipswich, MA  01938

Mercury Brewing & Distribution Co., Inc.
23 Hayward Street
Ipswich, MA  01938

NYLAJO, LLC
2 Central Street
Ipswich, MA  01938

Peter McAllister
6 Cedar Road
Boxford, MA  01921

Richard T. Caram & Sons, Inc.
134 Central Street
Rowley, MA  01969

Robert Martin
221R Washington Street
Topsfield, MA  01983

Tax Collector
Town of Ipswich
26 Green Street
Ipswich, MA  01938

Thomas Hagan
103 Kensington Road
Hampton Falls, NH  03844


Todd Darling
18 Sheffield Road
Boxford, MA  01921

Michael J. Goldberg, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, MA 02210
(Counsel to the Debtor)

Assistant U.S. Trustee
John Fitzgerald
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Douglas B. Rosner, Esq.
Gregory O. Kaden, Esq.
Goulston & Storrs LLP
400 Atlantic Ave.
Boston, MA  02110
(Counsel to Danversbank)