> **THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN. ACCEPTANCE MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THIS FORM OF DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT, BUT HAS NOT YET BEEN APPROVED.**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re: | Chapter 11 |
| BREWERY PROPERTIES GROUP, LLC | Case No. 11-14208-JNF |
| Debtor-in-possession. | |

**DISCLOSURE STATEMENT FOR
DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN**

Michael J. Goldberg (BBO #551869)
A. Davis Whitesell (BBO #551462)
Andrew Imbriglio (BBO #676049)
CASNER & EDWARDS, LLP
303 Congress Street
Boston, MA 02210
Tel.: (617) 426-5900
Fax: (617) 426-8810
Email: *goldberg@casneredwards.com*
Counsel for the Debtor


BREWERY PROPERTIES GROUP, LLC

Dated: November 29, 2011

I.    **INTRODUCTION**

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code"), the debtor Brewery Properties Group, LLC (the "Debtor"), provides this Disclosure Statement (the "Disclosure Statement") to all of the Debtor's known creditors. The purpose of this Disclosure Statement is to provide such information as the Debtor has deemed necessary for its creditors to make an informed decision in exercising their rights to vote upon the *Debtor's First Amended Chapter 11 Plan* (the "Plan") dated as of November 1, 2011. The Plan, a copy of which accompanies this Disclosure Statement as Exhibit A, was filed with the Bankruptcy Court on November 1, 2011. Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Plan. Other terms shall have the meanings ascribed to them in the Bankruptcy Code. To the extent there may be any inconsistency between the Plan and the Disclosure Statement, the Plan shall control.

*Why Should Creditors Support this Plan?*

The Debtor recommends that you vote to accept the Plan. The Debtor believes that the treatment provided to all of the Debtor's creditors is fair and reasonable, inasmuch as the Plan provides the means for implementation of a global settlement agreement negotiated by the Debtor with substantially all of the Debtor's creditors. The global settlement agreement resolves disputes with the Debtor's principal secured creditor, and provides for substantial payments on account of general unsecured claims that, absent agreement with the secured creditor, might be at risk of non-payment.

*What Is the Basic Plan?*

The Debtor's principal asset is the real estate, and partially-renovated brewing facility built thereon (the "Building"), located at 2 Soffron Lane, Ipswich, Massachusetts (the "Property"). The Property is subject to a first priority mortgage originally granted to Danversbank to secure a loan used to acquire the Property and to construct the Building. In 2010, Soffron acquired the loan from Danversbank, and currently asserts a claim of more than $2 million on account of the loan and related mortgage.

The Debtor is a party to a lease for the Property dated November 1, 2008 (the "Lease") with Mercury Brewing and Distribution Co., Inc. ("Mercury"), pursuant to which Mercury was to have relocated its brewing operations to the Building. The Debtor believes that the Lease required Mercury to commence paying rent on April 1, 2009. Mercury has asserted that it was never required to pay rent under the Lease due to the Debtor's failure to complete the renovation of the Building. Because rental income was to have been used to pay the Loan, the Debtor was unable to make scheduled payments on the Loan.

As of the Petition Date, Mercury and the Debtor were engaged in litigation over the rent payments due under the Lease (the "Rent Arrearage") and related matters. In addition, Soffron commenced suit against the Debtor to enforce the Loan.

The Plan is predicated on a global settlement of (i) the disputes between and among the

2

Debtor, Mercury, and Soffron arising with regard to the Loan and the Rent Arrearage, (ii) substantially all related claims asserted by the members and principals of these three entities, and (iii) the claims asserted by the Contractors (as that term is defined in the Global Settlement Agreement) who provided goods and services incident to construction of the Building for which they have not been paid. This global settlement agreement (the "Global Settlement Agreement") is attached as Exhibit A to the Plan, and will become effective among the settling parties upon the Effective Date of the Plan. A schedule of additional documents to be executed in connection with and to implement the terms of the Plan (the "Global Settlement Documents") is attached to the Plan as Exhibit B. The Plan provides the means for the Debtor to obtain authority to enter into, and obtain approval of, the Global Settlement Agreement, as well as to address its remaining liabilities to creditors who are not parties to the Global Settlement Agreement.

In brief, the Plan provides that:

- Except as otherwise agreed by the Holders of Allowed Administrative Expenses and Allowed Priority Claims, all Holders of Allowed Administrative Expenses and Allowed Priority Claims will be paid in Cash in the full amount of their Allowed Claims;

- The Holder of the Soffron Secured Claim will be obtain title to the Property, the Building, all of Debtor's right and interest in the Personal Property attached to, located at or used in connection with the Property and Building, and substantially all other assets of the Debtor (excepting only the Wardley Claims), free and clear of all liens, claims and encumbrances (except as described in the fifth bullet point below pertaining to the Town of Ipswich);

- The parties to the Global Settlement Agreement will exchange releases of their various claims against one another or covenants not to sue, with certain limited exceptions as set forth in the Global Settlement Agreement;

- Holders of Class 5 Claims, who (except for NYLAJO on account of its subordinated Class 3 Claim) are all Contractors, will have the rights afforded them under the Contractor Agreements negotiated with the Debtor and Soffron, providing for substantially full payment of their claims (and NYLAJO will have the right to payment from Soffron as set forth in Global Settlement Agreement).

- The Town of Ipswich will retain all of its rights with respect to real estate taxes owed on the Property (and its liens securing such taxes); the Global Settlement Agreement provides that Soffron will pay such taxes on or promptly after the Effective Date; and

- On the Effective Date, the Interests in the Debtor shall be restated as provided in an amended operating agreement for the Debtor (the "<u>Amended Operating Agreement</u>"), which Amended Operating Agreement establishes the rights and obligations of the Debtor's members on and after the Effective Date.

**EACH CREDITOR SHOULD REVIEW THE PLAN AND DISCLOSURE**

STATEMENT CAREFULLY, INCLUDING ALL EXHIBITS, IN THEIR ENTIRETY, AND DETERMINE WHETHER OR NOT TO ACCEPT OR REJECT THE PLAN BASED UPON THAT CREDITOR'S INDEPENDENT JUDGMENT AND EVALUATION. The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.

Consistent with the requirements of the Bankruptcy Code, the Debtor's goal is to obtain an order from the Bankruptcy Court confirming the Plan. That order, the "Confirmation Order," will contain other provisions as well, but approval of the Plan is the core of such an order. After voting on the Plan is completed, a confirmation hearing will be held before the Bankruptcy Court. If the Bankruptcy Court then confirms the Plan, the Plan becomes binding on the Debtor, its creditors, its equity holders, and other affected parties, including those who may have voted against the Plan.

Certain of the information contained in this Disclosure Statement is by its nature forward looking, and contains estimates, assumptions, and projections that may be materially different from actual, future results. The statements made in this Disclosure Statement are made as of the date hereof, unless another time is specified in this Disclosure Statement. The delivery of this Disclosure Statement shall not, under any circumstances, create an implication that there has been no change in any facts set forth in this Disclosure Statement since the date hereof.

This Disclosure Statement has **[not yet]**[1] been approved by the Bankruptcy Court as providing information that the Bankruptcy Court deemed adequate to permit creditors of the Debtor to make an informed judgment in exercising their right to vote for or against the Plan. A HEARING ON THE ADEQUACY OF THE DISCLOSURE STATEMENT IS SCHEDULED FOR NOVEMBER ___, 2011 AT _:_ .M. THE DEADLINE FOR FILING OBJECTIONS TO THIS DISCLOSURE STATEMENT IS NOVEMBER __, 2011 AT 4:30 P.M.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

No representations concerning the Debtor including the value of its assets, or the aggregate dollar amount of Claims which may be allowed, are authorized other than as set forth in this Disclosure Statement. Any representations, warranties or agreements made to secure acceptance or rejection of the Plan by creditors of the Debtor, which are other than as contained in this Disclosure Statement, should not be relied upon in voting on the Plan.

II. BACKGROUND AND HISTORY

A. Introduction

---

[1] To be removed upon approval of this Disclosure Statement by this Court.

4

The Debtor was formed on January 23, 2008. Its initial managers were Robert Martin ("Martin") and Todd Darling ("Darling"), who also held 100% of the Debtor's Membership Interests. At the time, Martin was the President of Mercury, a position which he continues to hold. The Debtor was formed for the sole purpose of acquiring the Property and renovating the Building, which was to serve as the new location for Mercury's growing beer brewing and distribution operations (the "Project"). To finance the $825,000 purchase price for the Property and the costs of renovating of the Building, the Debtor and Mercury obtained a $1.98 million real estate bond financing (the "Real Estate Loan") from Danversbank (the "Bank"). The Real Estate Loan is secured by a first mortgage on the Property (the "Mortgage"). Repayment of the Real Estate Loan was guaranteed by Martin and Darling; in addition, another member of the Debtor, Peter McAllister, provided a $250,000 completion guaranty to the Bank. To aid in the funding of the Building's renovation cost, the Debtor raised additional funds from the sale of Membership Interests to investors in the Debtor, including Darling.

The Debtor entered into the Project believing that it was responsible for financing the renovation of the Building, while Mercury was to pay for the cost of tenant improvements and equipment needed to operate the Building as a brewery. At the same time that the Real Estate Loan was procured, Mercury obtained a $757,300 term loan (the "Mercury Term Loan") from the Bank, a portion of which refinanced existing indebtedness of Mercury, and another portion of which was advanced to fund tenant improvement and equipment costs. In addition, the Bank extended a $100,000 working capital line of credit to Mercury (the "Mercury Credit Line" and, together with the Mercury Term Loan, the "Mercury Loans"). The Mercury Loans were guaranteed by the Debtor (the "Mercury Loan Guaranty"), Martin and an entity known as Brewery Food Group, LLC ("BFG"). BFG was formed for the purpose of operating a pub at the Building.

In connection with the Real Estate Loan, the Debtor and Mercury entered into the Mercury Lease, which provided, *inter alia*, for monthly rental payments of $19,000. Among their disputes, described below, the Debtor and Mercury disagree over whether monthly rent was to commence on April 1, 2009, regardless of whether the Project was completed at the time.

The Debtor arranged for the services of an architect, Frank Wardley, a partner of Pitman & Wardley Architects of Salem, Massachusetts ("Wardley") to design plans for the Project (the "Plans"). The Debtor also entered into a fixed-price construction contract (the "General Contract") with a general contractor, Thomas Hagan ("Hagan") in the amount of $1,343,374; included in the fixed price was a 10% contingency.

**B.    Construction Cost Overruns and Disputes**

Unfortunately, the Project was plagued by disputes between Mercury and the Debtor, and by construction delays and cost overruns. A significant disagreement arose between the two parties regarding costs allocable to the Debtor under the parties' agreements. The Debtor believes that a substantial number of items were improperly charged to the Debtor, thus depleting funds that should have been available to fund base building renovation costs. Among the out-of-scope items that the Debtor believes were improperly allocated to the Debtor were the following: (i) a full basement suite complete with HVAC, (ii) pharmaceutical grade plumbing

supplies, (iii) CO2 plumbing, (iv) steel for brew house plumbing, (v) brew house plumbing and old boiler retrofitting, (vi) costs for a new well head, and (vii) two full baths, showers and a laundry room.

The Debtor contends that in November 2009, the Debtor was informed of the cost overruns that resulted from the above and other problems. At the time, the Debtor was asked to raise $200,000 in additional funds to complete the Project, and was assured that no further funds would be needed. However, these additional contributions were nowhere near enough to complete the Project. In fact, the Contractors have asserted claims against the Debtor, in litigation and otherwise, totaling $471,881.72. Several of the unpaid Contractors asserted Statutory Liens, in the form of mechanics liens, against the Property. In addition to the outstanding amounts due to the Contractors, the Debtor procured an estimate of the costs to complete the Project of approximately $525,000.

Mercury brought an action in the Superior Court, Essex County against the Debtor seeking damages for the failure to complete the Project; the action is titled *Mercury Brewing and Distribution Co., Inc. v. Brewery Properties Group, LLC,* Massachusetts Superior Court, Essex County, (Civil Action No. 10-1292) (the "Rent Action"). The Debtor has filed counterclaims against Mercury in the Rent Action, seeking, *inter alia*, payment of the Rent Arrearage of $475,000. The Debtor has removed the Rent Action to the Bankruptcy Court pursuant to 11 U.S.C. 1452(a).

### C. Transfer of the Real Estate Loan and Loan Defaults

On or about September 1, 2010, the Bank assigned its interests in the Real Estate Loan to Soffron Holdings LLC ("Soffron"), a Massachusetts limited liability company. On February 15, 2011, the Bank, on behalf of Soffron, sent both the Debtor and Mercury a notice of default with respect to the Real Estate Loan. In addition, the Bank, again on behalf of Soffron, issued a payment demand to Darling. Without the cash flow from the Mercury Lease to fund payments on the Real Estate Loan, and without a result in the Rent Action, the Debtor was not in a position to cure the defaults arising thereunder. In order to protect the Project from loss due to foreclosure, the Debtor filed its petition for relief under Chapter 11 on May 3, 2011.[2]

### III. THE DEBTOR'S ASSETS, LIABILITIES AND BUSINESS PLAN; THE CHAPTER 11 CASE

#### A. Assets and Liabilities

As of the Petition Date, the Debtor's principal asset was the Property. Because of its current incomplete state and dispute with Mercury over the Mercury Lease, the current market value of the Property is less than the outstanding balance of the Real Estate Loan. As a result, and pursuant to Bankruptcy Code Section 506(a), creditors holding Liens on the Property that are junior in priority to the Mortgage hold General Unsecured Claims.

---

[2] On or about July 1, 2011, the Bank was acquired by People's United Bank. People's United Bank, as successor by merger to the Bank (also referred to as the "Bank" herein), administers the Real Estate Loan for the benefit of Soffron, in its capacity as Trustee for the bonds evidencing the Real Estate Loan.

6

In addition to the Property, and as is reflected in its Schedules of Assets and Liabilities filed on the Petition Date, the Debtor held a number of claims against parties involved in the Project. Included in these claims (without in any way limiting or waiving any of the Debtor's rights and remedies, which are expressly reserved) are claims against Wardley for his mismanagement of the construction project and negligent work, which claims are being preserved for the benefit of the Debtor and its Members under the Plan. Claims against the Contractors, Soffron, Sheehan, Martin and the Bank are being released under the Global Settlement Agreement.

As of the Petition Date, the approximate balance outstanding under the Real Estate Loan was $1,915,469.41, plus attorney fees and other collection costs. The Real Estate Loan is secured by the Mortgage; in addition, as noted above, Mercury is a joint obligor with respect to the Real Estate Loan, and the Loan is guaranteed by Martin and Darling. Peter McAllister, a member of the Debtor, provided a completion guaranty for the benefit of the Bank in the amount of $250,000. The Real Estate Loan is governed and secured by the Senior Loan Documents.

Pursuant to the Mercury Loan Guaranty, the Debtor has guaranteed the Mercury Loans, having an aggregate principal balance of $857,300. The Debtor does not have current information concerning the outstanding balance of the Mercury Loans. On information and belief, the Bank has not declared the existence of a default under the Mercury Loans or taken any enforcement action with respect thereto. Pursuant to the Global Settlement Agreement, the Bank will be providing a covenant not to sue the Debtor under the Mercury Loan Guaranty.

As of the Petition Date, the Debtor was obligated to the Town of Ipswich for real property taxes in the approximate amount of $18,124.35.[3] The Claim of the Town of Ipswich is secured by a first-priority Lien on the Property.

NYLAJO, LLC, a Massachusetts limited liability, holds a Secured Claim against the Debtor in the amount of $20,000 plus accrued and unpaid interest. The NYLAJO Claim arises from the sale by NYLAJO to the Debtor of a lot that currently comprises a portion of the Property, and is subordinated to the Soffron Secured Claim by virtue of a Subordination Agreement dated December 17, 2008. Because the value of the Property does not exceed the aggregate amount of the Claims of the Town of Ipswich and Soffron, the NYLAJO Claim will be treated as a General Unsecured Claim in Class 5 under the Plan.

A number of the Contractors have filed Statutory Liens against the Property. These Claims – totaling eleven (11) in number and $547,572.71 in amount – will be treated as General Unsecured Claims in Class 5 under the Plan, and satisfied as provided in the Global Settlement Agreement.

**B.      Events During The Chapter 11 Case**

The Debtor filed its petition for relief on May 3, 2011. On May 6, 2011, the Debtor filed

---

[3] Under the Mercury Lease, Mercury was required to pay real estate taxes accruing with respect to the Property. Accordingly, real estate tax arrearage has been included in the amount of the Rent Arrearage.

7

its initial plan or reorganization (the "Initial Plan") and a related proposed disclosure statement. The original plan and disclosure statement have been superseded by the Plan and the Disclosure Statement, which reflect the outcome of litigations and settlement discussions among principal parties leading to the Global Settlement Agreement.

On May 4, 2011 the Debtor filed a notice of removal, pursuant to 28 U.S.C. 1452(a), in the Rent Action. Under the Initial Plan, the Debtor intended to pursue the Rent Action to judgment, and to utilize payments on account of the Rent Arrearage to fund payments to creditors thereunder.

On June 23, 2011, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee"), consisting of:

CG&V Service, LLC
Reading, Massachusetts

Richard T. Caram & Sons, Inc.
Rowley, Massachusetts

Breen & Sullivan Mechanical Services, Inc.
Danvers,Massachusetts

Michael Guenther, of CG&V Service, LLC serves as Chair of the Creditors' Committee. Murphy & King, Professional Corporation and Kathleen R. Cruickshank, Esq., of that firm serve as counsel to the Creditors' Committee.

As noted above, the Debtor filed the Initial Plan shortly after the commencement of this Chapter 11 Case. The basic terms of the Initial Plan provided for the following:

- Collection of the Rent Arrearage owed to the Debtor under the Mercury Lease (which, as of the Petition Date, the Debtor estimated was $512,124.35);

- Raising of additional capital of up to $150,000 from the certain Members of the Debtor in exchange for the issuance of the New Membership Interests;

- Reinstatement of the Real Estate Loan, and utilization of the Rent Arrearage and the new funding to cure all outstanding payment defaults under the Real Estate Loan;

- Use of a portion of the Rent Arrearage and the new capital to fund the costs of completing the Project; and

- Payment of a 10% up-front dividend to the Holders of Allowed General Unsecured Claims.

- Payment of the balance of the Allowed Claims of the Holders of General Unsecured Claims over time, from the excess of the payments of rent due under

8

the Mercury Lease over the payments of debt service required under the Senior Loan Documents.

After the filing of the Initial Plan, the Debtor and Soffron entered into negotiations intended to resolve the numerous issues that had arisen among the Debtor, Soffron, Mercury and the Contractors that had performed work on the Project. Because of the number of parties involved – eleven Contractors and all 14 of the Members of the Debtor – the negotiations have been difficult and protracted. Now that the negotiations have concluded, and resulted in the agreements set forth in the Plan and the Global Settlement Agreement, the Debtor believes that its creditors will be well served by the provisions thereof. Among other things, the Plan and the Global Settlement Agreement eliminate the need to litigate the Rent Action and the risk and expense of such litigation that would have been required to procure confirmation of the Initial Plan. The terms of the Plan and the Global Settlement Agreement are explained below.

## IV. THE PLAN OF REORGANIZATION

THE DISCUSSION OF THE PLAN SET FORTH BELOW IS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND ITS SCHEDULES, THE TERMS OF WHICH ARE CONTROLLING. HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN IN ITS ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

### A. General Overview Of The Plan

The Plan contains the following basic terms:

- The Property, the Building, all of Debtor's right, title and interest to the Personal Property attached to, located at or otherwise used in connection with the Building, and all Personal Property of the Debtor (except the Wardley Claims) will be conveyed to Soffron free of liens, claims and encumbrances (except for the lien of the Town of Ipswich, which will not be extinguished by the Plan);

- Soffron will fund payments to the Contractors (as that term is defined in the Global Settlement Agreement and Plan) sufficient to satisfy their Allowed Claims in full;

- Certain of the Members of the Debtor will relinquish their shares of preferred stock in Mercury to Soffron or its designee;

- Robert Martin will relinquish his Membership Interests in the Debtor, and Todd Darling will relinquish his Membership Interests in BFG;

- The parties to the Global Settlement Agreement, and the Contractors, will exchange releases or covenants not to sue; and

- The Debtor's claims against Frank Wardley, Peter Pitman and Wardley & Pitman Architects will be preserved for the benefit of the Members of the Debtor; and

- The Debtor's operating agreement will be restated as provided in the Plan.

The provisions of the Plan are discussed more fully below.

**B.    Classification And Treatment Of Claims**

1. Class 1 – Secured Claim of the Town of Ipswich.

    (a) Impairment: Class 1 is unimpaired by the Plan. The Holder of the Allowed Claim in Class 1 is deemed to accept the Plan.

    (b) Treatment: The Holder of the Allowed Class 1 Claim shall retain all of its legal, equitable and contractual rights. Notwithstanding such non-impairment of the Class 1 Claim, (i) the Global Settlement Agreement provides for Soffron to pay the Allowed Class 1 Claim in full on or promptly after the Effective Date, and (ii) the Holder of the Allowed Class 1 Claim may accept such other treatment as may be agreed to by such Holder.

2. Class 2 – Secured Claim of Soffron Holdings, LLC.

    (a) Impairment: Class 2 is impaired by the Plan. The Holder of the Allowed Claim in Class 2 is entitled to vote to accept or reject the Plan.

    (b) Treatment: The Holder of the Soffron Secured Claim shall receive the treatment provided by the Global Settlement Agreement, including without limitation receipt of the Premises and the Building pursuant to its receipt of the Deed, the Bill of Sale, and the General Assignment of Intangible Personal Property

3. Class 3 – NYLAJO Claim.

    (a) Impairment: Class 3 is impaired by the Plan. The Holder of the Allowed Class 3 is entitled to vote to accept or reject the Plan.

    (b) Treatment: On the Effective Date, the Lien against the Premises held by the Holder of the Class 3 Claim shall be deemed extinguished. The Holder of the Allowed Class 3 Claim shall be entitled to receive the payment from Soffron provided for under the Global Settlement Agreement.

4. Class 4 – People's United Claims.

    (a) Impairment: Class 4 is impaired by the Plan. The Holder of the Allowed Class 4 Claims is entitled to vote to accept or reject the Plan.

    (b) Treatment: On and after the Effective Date, the Holder of the Allowed

Class 4 Claims shall have the rights and obligations afforded it under the Global Settlement Agreement.

4. Class 5 – General Unsecured Claims.

   (a) Impairment: Class 5 is impaired by the Plan. The Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

   (b) Treatment: On and after the Effective Date, each Holder of an Allowed Class 5 Claim shall have the rights and obligations afforded it under the Contractor Agreement to which such Holder is a party. For the avoidance of doubt, Soffron shall not be responsible for paying any claims of Holders of General Unsecured Claims other than the payments to be made to the Contractors pursuant to the Global Settlement Agreement.

5. Class 6 – Membership Interests.

   (a) Impairment: Class 6 is unimpaired by the Plan. The Holders of Class 6 Interests are deemed to accept the Plan, and no votes will be solicited from such Holders.

   (b) Treatment: On and after the Effective Date, each Holder of a Class 6 Interest shall have the rights and obligations afforded it under the Global Settlement Agreement and under the Amended Operating Agreement.

V. **MEANS FOR IMPLEMENTATION OF THE PLAN**

   A. **Distributions to Creditors Under Plan**

   As soon as practicable after the Effective Date, the Reorganized Company will make Cash payments to Holders of Allowed Administrative Expenses and Allowed Priority Claims. The source of Cash for these payments will be Cash on hand as of the Effective Date, including as provided by Members of the Debtor for this purpose.

   B. **Implementation of Global Settlement Agreement**

   On the Effective Date, the Debtor and all other parties to the Global Settlement Agreement shall consummate the transactions provided for in the Global Settlement Agreement, and shall, without limiting the foregoing, execute and deliver all of the Global Settlement Documents. For the avoidance of doubt, the Effective Date shall only occur upon the Closing under the Global Settlement Agreement and the execution and delivery of the Global Settlement Documents to be executed and delivered at such Closing.

   C. **Management of the Reorganized Company**

   On and after the Effective Date, the management and operation of the Reorganized

Company shall governed by the Amended Operating Agreement.

### D.     Executory Contracts And Unexpired Leases

All of the Debtor's executory contracts and unexpired leases will be deemed rejected pursuant to Section 365 of the Bankruptcy Code effective as of the Effective Date (except for the Mercury Lease, which shall be terminated by agreement of the Debtor and Mercury pursuant to the terms of the Global Settlement Agreement). All General Unsecured Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, shall be treated as Claims in Class 5 under the Plan, shall be deemed disallowed against the Debtor and the Estate, and the obligations to the Contractors (as that term is defined in the Plan and Global Settlement Agreement) only shall be deemed satisfied through Soffron's performance of its payment obligations to the Contractors pursuant to the Global Settlement Agreement. For the avoidance of doubt, Soffron shall not be responsible for paying any claims of Holders of General Unsecured Claim other than the payments to be made to the Contractors pursuant to the Global Settlement Agreement.

### E.     Summary Of Other Plan Provisions

#### 1.     Discharge of Indebtedness

Except as otherwise expressly provided in the Plan or the Confirmation Order, entry of the Confirmation Order shall, subject only to occurrence of the Effective Date (which is conditioned upon the execution and delivery of the Global Settlement Documents upon the Closing under the Global Settlement Agreement, including without limitation Soffron's payment of the amounts due each Contractor under its Contractor Agreement), constitute the complete discharge and release as against the Reorganized Company of any liability, debt, or obligation of, or claim or cause of action against, or Interest in, the Debtor or the Estate that arose before the Effective Date, including, without limitation, any Claims against the Debtor of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, any Claims against the Debtor of any other nature, including, without limitation, any interest accrued thereon from and after the Petition Date, and any equity interest in the Debtor, whether or not (i) a proof of Claim or Interest based on such liability, debt, obligation, claim, cause of action or Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Interest is an Allowed Claim or Interest, or (iii) the Holder of such Claim or Interest has accepted the Plan. For the avoidance of doubt, Soffron shall have no obligation to pay any Claim except for the Claims of the Contractors, NYLAJO and the Town of Ipswich.

#### 2.     Objections to Claims and Estimation Of Claims

The Debtor will have the right to make and file objections to Claims, Interests and Administrative Expenses, and will serve a copy of each objection upon the holder of the Claim, Interest, or Administrative Expense to which the objection is made. Except as expressly provided in the Plan, the Debtor reserves the right to object to any Claim and/or to seek to subordinate any Claim or to recharacterize any such Claim as an Interest.

#### 3.     Exculpations, Releases and Indemnification

12

Sections 7.03 and 7.04 of the Plan contain provisions that set forth the standard of liability for various persons and entities in connection with the Chapter 11 Case. These provisions will affect creditors, equity security holders, and other parties. Interested parties are encouraged to read the entirety of these Sections, which are summarized herein.

Section 7.04 of the Plan provides that neither the Debtor, nor any of its employees, officers, directors, members, agents, or representatives employed as of the Confirmation Date, nor any professional person employed by any of the foregoing, nor the Official Committee of Unsecured Creditors appointed by the United States Trustee in this case, nor its members, professionals, trustees, agents, or representatives as of the Confirmation Date, nor any professional persons employed by any of the foregoing, will have or incur any liability to any person or entity for any act taken or omission made in connection with or related to negotiating, formulating, implementing, confirming, or consummating the Plan, the Disclosure Statement, or any contract, instrument, security, release, or other agreement, instrument, or document created in connection therewith, except for willful misconduct or gross negligence. As specified in Section 1125(e) of the Bankruptcy Code, Section 7.04 of the Plan provides that entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, will not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

4. **Revesting Of Wardley Claims And Defensive Rights of Action**

Under Section 5.02(b) of the Plan, on the Effective Date, the Wardley Claims shall revest in the Debtor, free and clear of all liens, claims and encumbrances, and the Debtor shall retain, solely for purposes of asserting a defense of set-off (and shall not be entitled to assert affirmatively as a plaintiff, third-party plaintiff, cross-claim plaintiff or *counterclaim* plaintiff), all Rights of Action constituting a defense or setoff against any claims or causes of action asserted against the Debtor.

5. **Implementation Of Bankruptcy Code Section 1146(c)**

Any transfers or other transactions that occur pursuant to or in connection with the Plan or the Confirmation Order will be exempt from tax under any federal, State, or local law imposing a stamp tax, real estate transfer tax, recording tax, or similar tax.

6. **Retention Of Jurisdiction**

Article VIII of the Plan generally provides for the retention of jurisdiction by the Bankruptcy Court for the purposes of among other things, (i) determining disputes relating to Administrative Expenses, Claims and Interests, (ii) hearing proceedings on the Wardley Claims, (iii) adjudicating matters affecting the Chapter 11 Case, the Plan, and the administration of the Estate, (iv) enforcing the Debtor's discharge, and (v) all other issues presented by or arising under the interpretation, implementation, or enforcement of the Plan or the Confirmation Order.

### 7.     Effective Date

The Plan's Effective Date will occur on the Closing Date as defined in and established pursuant to Section 4 of the Global Settlement Agreement. For the avoidance of doubt, the Effective Date shall be deemed not to occur unless and until the parties to the Global Settlement Agreement have conducted the Closing under the Global Settlement Agreement by executing and delivering the Global Settlement Documents on the Closing Date.

As soon as practicable after the Effective Date has occurred, the Reorganized Company will file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

### H.     Fair And Equitable Treatment

The Plan may be confirmed over the dissenting vote of certain classes of creditors pursuant to Section 1129(b) of the Bankruptcy Code. If any impaired Class of Claims or Interests entitled to vote on the Plan fails to accept the Plan, the Debtor will request that the Bankruptcy Court confirm the Plan pursuant to Section 1129(b).

## VIII.     CERTAIN TAX CONSEQUENCES OF THE PLAN

Because the tax consequences of the Plan may vary based on individual circumstances, each holder of a Claim or Interest is urged to consult with its own tax advisor as to the consequences of the Plan to it under federal and applicable state, local, and foreign tax laws.

## IX.     VOTING PROCEDURES; BAR DATES; CONFIRMATION HEARING

### 1.     Time and Place of the Confirmation Hearing

The Plan cannot become effective until after the Bankruptcy Court has confirmed it and the conditions to the Effective Date set forth in the Plan have either been satisfied or waived.

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will take place on _____, 2011 at _____, Eastern Time, before the Honorable Joan N. Feeney, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Massachusetts, Eastern Division, in Courtroom #__, 12th Floor, John W. McCormack Post Office and Courthouse, 5 Post Office Square, Boston, Massachusetts 02109. The Confirmation Hearing may be continued from time to time without further notice, except as announced in open Court.

### 2.     Voting Instructions

A Ballot to be used for voting to accept or reject the Plan is enclosed with all copies of this Disclosure Statement mailed to all persons entitled to vote. Each holder of a Claim is entitled to vote, provided that either (a) its claim has been scheduled by the Debtor and such

claim is not scheduled as disputed, contingent, or unliquidated, or (b) it has filed a proof of claim on or before the date set by the Bankruptcy Court as the last date for filing proofs of claim in this Chapter 11 Case, but in any event not later than the business date before the date set for a hearing on confirmation of the Plan, unless its claim is disallowed for voting purposes by the Bankruptcy Court.

Completed Ballots should be returned to:

Michael J. Goldberg, Esq.
CASNER & EDWARDS, LLP
303 Congress Street
Boston, MA 02210

**BALLOTS MUST BE <u>RECEIVED</u> ON OR BEFORE 4:30 P.M., BOSTON TIME ON_____,2011. ANY BALLOT RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM OR AN INTEREST, BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, SHALL BE DEEMED AN ACCEPTANCE.**

3.   **Claim Amount on the Ballot**

On each Ballot there is a space in which each creditor may write the amount of such creditor's claim. If the Claim amount submitted differs from the amount of the Claim as shown on the Schedules or as allowed by Final Order of the Bankruptcy Court, then the dollar amount of such Claim for voting and distribution purposes shall be determined first, by reference to the Final Order allowing such Claim, or, if no such order has been entered, by the amount specified in a timely filed proof of Claim, or if no such proof of Claim has been filed, then as determined by the Debtor's Schedules; provided, however, that if an objection to a Claim has been filed with the Bankruptcy Court and is pending, the Claim shall be deemed to be disallowed for voting purposes except as otherwise provided by order of the Bankruptcy Court .

A Ballot cast with respect to the Plan does not result in the filing or allowance of a Claim. Nor does the casting of a Ballot relieve a creditor of the obligation to file timely a proof of claim. The Reorganized Company reserves the right to object to any Claims until the deadline imposed by the Plan, as such deadline may be extended as provided in the Plan or by the Court.

4.   **Deadline for Objecting to Confirmation of the Plan**

All creditors and stockholders are entitled to be heard with respect to confirmation of the Plan, even if they are not eligible to vote to accept or reject the Plan. Objections to confirmation of the Plan must be filed with the Bankruptcy Court by 4:30 p.m., Eastern Time, on _____, 2011 and served so as to be received on that date by (i) counsel for the Debtor, Casner & Edwards, LLP, 303 Congress Street, Boston, Massachusetts 02210, Attention: Michael Goldberg, Esq.; and (ii) the Office of the United States Trustee for the District of Massachusetts, Eastern Division, John W. McCormack Post Office and Courthouse, 5

Post Office Square, Boston, Massachusetts 02109, Attention: _____.

5.     **Administrative Expenses Bar Date**

All parties seeking payment of Administrative Expenses (including professionals seeking compensation under Bankruptcy Code Sections 330 and 331, parties seeking compensation for costs incurred in making a "substantial contribution" under Section 503 of the Bankruptcy Code, and taxing authorities) must file with the Bankruptcy Court and serve upon the Reorganized Company a request for payment of such Administrative Expense prior to the applicable deadline set forth below, provided, however, that parties seeking payment of post-petition ordinary course trade obligations, post-petition payroll obligations incurred in the ordinary course of the Debtor's postpetition business and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not file such a request.

> **General Deadline: The deadline for all Persons other than governmental claimants including professionals seeking compensation under Bankruptcy Code Section 330 and 331 to file requests for payment of Administrative Expense is thirty (30) days after the Plan's Effective Date.**
>
> **Governmental Deadline: All requests for payment of Administrative Expenses by governmental units for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date and for which no bar date has otherwise been previously established, must be filed and served on counsel for the Debtor, Michael J. Goldberg, Esq., Casner & Edwards, LLP, 303 Congress Street, Boston, MA 02210, on or before the later of (i) sixty (60) days after the Effective Date, and (ii) one hundred twenty (120) days after the Reorganized Company's filing of tax return for such taxes.**

**Failure to comply with these deadlines shall forever bar the holder of an Administrative Expense from seeking payment thereof.**

7.     **Materials To Be Filed In Support Of Confirmation**

Among other documents that the Debtor will file in support of confirmation of this Plan, the Debtor will file and serve the Plan Documentary Supplement no later than five (5) days prior to the Confirmation Hearing.

8.     **Whom To Contact To Obtain More Information Regarding The Plan**

Any interested party desiring further information about the Plan should contact in writing

Any interested party desiring further information about the Plan should contact in writing Casner & Edwards, LLP, 303 Congress Street, Boston, MA 02210, Attention: Michael J. Goldberg, Esq.

## X. PLAN ALTERNATIVES/LIQUIDATION ANALYSIS

The Debtor believes that the Plan provides holders of Claims with the potential for the greatest realization on those Claims. As is described in greater detail below, the Debtor also believes that no other realistic alternative to the Plan would provide creditors with meaningful distributions on account of their claims.

Were the Plan not to be confirmed and in the event no competing plan (such as the Initial Plan) were to be proposed, the likely alternative would be for Soffron to move for relief from the automatic stay to foreclose its mortgage on the Property. If Soffron were granted relief from stay to foreclose, the Debtor expects that Soffron would recover less than the amount of its secured claim through foreclosure and would have the right to assert its deficiency claim against the Debtor. Any foreclosure sale for less than what Soffron is owed would extinguish the Statutory Liens. The Debtor would have no funds with which to make any payments to creditors on account of their Claims except for funds recovered through prosecution of causes of action against Mercury, Soffron, Sheehan, and other entities such as was contemplated under the Initial Plan. Given the risk and expense of such litigation, and in light of the potentially significant deficiency claim of Soffron, the Debtor believes that the Plan, and the Global Settlement Agreement on which it is predicated, provides a significantly better outcome than any other currently foreseeable scenario. If the case were converted to one under Chapter 7 of the Bankruptcy Code, a Chapter 7 trustee would be appointed to liquidate the assets of the Debtor. As is indicated herein, the Debtor believes that there is no equity in its real estate. A Chapter 7 trustee would investigate all causes of action that the Debtor may hold against Mercury, Soffron, Sheehan, and other entities. Given the risk and expense of the litigation, and the potentially significant deficiency claim of Soffron, the Debtor believes that the Plan and the Global Settlement Agreement provide a more favorable outcome than would liquidation of the Debtor's assets by a Chapter 7 trustee.

In sum, based upon the Debtor's analysis of the likely alternatives to confirmation of the Plan, the Debtor believes that the Plan represents the highest available recovery for the Debtor's creditors, and a far better result than a foreclosure by Soffron – which would leave nothing to be paid to holders of General Unsecured Claims.

DATED: November 29, 2011

BREWERY PROPERTIES GROUP, LLC

By: _____
Its Manager

17

Case 11-14208   Doc 91   Filed 11/29/11   Entered 11/29/11 17:56:16   Desc Main
Document    Page 18 of 19

# EXHIBIT A

## Debtor's Chapter 11 Plan